611 A.2d 242

COMMONWEALTH of Pennsylvania

v.

Nicodemo SCARFO, Appellant.

COMMONWEALTH of Pennsylvania

v.

Francis IANNARELLA, Jr., Appellant.

COMMONWEALTH of Pennsylvania

v.

Joseph LIGAMBI, Appellant.

COMMONWEALTH of Pennsylvania

v.

Salvatore J. MERLINO, Appellant.

COMMONWEALTH of Pennsylvania

v.

Philip NARDUCCI, Appellant.

COMMONWEALTH of Pennsylvania

v.

Frank NARDUCCI, Jr., Appellant.

COMMONWEALTH of Pennsylvania

v.

Nicholas MILANO, Appellant.

COMMONWEALTH of Pennsylvania

v.

Lawrence MERLINO, Appellant.

Superior Court of Pennsylvania.

Argued Jan. 9, 1992.

Filed June 17, 1992.

Reargument Denied Aug. 25, 1992.

334

338

340

David M. McGlaughlin, George Henry Newman, Philadelphia, for Iannarella, appellant in No. 1444.

Norris Gelman, Philadelphia, for Scarfo, appellant in No. 1481.

Louis M. Natali, Philadelphia, for Ligambi, appellant in No. 1483.

Ramy I. Djerassi, Philadelphia, for Salvatore Merlino, appellant in No. 1516.

Stanford Shmukler, Philadelphia, for Philip Narducci, appellant in No. 1518 and Frank Narducci, appellant in No. 1519.

F. Emmett Fitzpatrick, Jr., Philadelphia, for Milano, appellant in No. 3136.

Nino V. Tinari, Philadelphia, for Lawrence Merlino, appellant in No. 3480.

Ann C. Lebowitz, Asst. Dist. Atty., Philadelphia, for Com., appellee.

Before CIRILLO, TAMILIA and FORD ELLIOTT, JJ.

CIRILLO, Judge.

Nicodemo Scarfo, Salvatore Merlino, Lawrence Merlino, Joseph Ligambi, Francis Iannarella, Philip Narducci and Frank Narducci, and Nicholas Milano each appeal from judgments of sentence entered in the Court of Common Pleas of Philadelphia County following their convictions of First–Degree Murder, Criminal Conspiracy and Possession of an Instrument of Crime. All defendants received the mandatory sentence of life imprisonment for the murder conviction.

Before reaching the merits of the defendants' claims, a preliminary matter must be addressed. These defendants sought to consolidate their appeals. This court, however, denied that motion. The defendants then filed individual briefs in which each party extensively adopted by reference the various arguments of the other parties. Consequently, issues which have been raised by one party have, for the most part, been adopted by the others and shall be addressed concurrently.

## I. FACTS [1]

The facts of the instant case concern the shooting death of Frank "Frankie Flowers" D'Alfonso. Nicodemo Scarfo headed the local organization of the La Cosa Nostra ("LCN"), otherwise known as the mafia or the mob. Non-initiated mafia hopefuls are called "proposed members" and have ties to the organization (are "with" the organization) but have yet to fulfill the requirements of initiation into

---

1. The factual statement is a synopsis of the many facts contained in the voluminous record. We shall explain further facts from the record as they are needed to resolve the particular issues to which they relate.

LCN. During the Scarfo regime, a proposed member had to participate in a killing in order to fulfill initiation requirements.

Scarfo first informed the other mafia officers of his command to kill D'Alfonso at a meeting at the Wok Restaurant on Walnut Street in Philadelphia. In attendance at the meeting were Scarfo, Salvatore Merlino, Larry Merlino (Salvatore's brother), and Iannarella and Thomas DelGiorno.[2] DelGiorno was a cooperating Commonwealth witness at the trial.

Scarfo ordered the killing of D'Alfonso because of his long-held dislike of D'Alfonso, a friend of former mafia boss Angelo Bruno, and because he was upset at the publicity D'Alfonso had received after Bruno's killing. This publicity suggested that D'Alfonso was to become or had become the Philadelphia family's boss. Scarfo had already become boss and was disturbed that D'Alfonso, who was not even a member of LCN, was receiving such notoriety. Scarfo ordered that proposed members Nicholas Milano and Philip Narducci carry out the killing with the aid of Frank Narducci and Eugene ("Gino") Milano.[3] Lawrence Merlino suggested that Scarfo "use Joe" Ligambi and that Ligambi "was ready" to become a member. Scarfo authorized Ligambi's addition to the assassination team. Scarfo promised to initiate the proposed members—Philip Narducci, Nicholas Milano and Ligambi ("the killers")—after they had killed D'Alfonso.

In preparation for the killing, Iannarella helped to procure the murder weapons and DelGiorno assisted Ligambi in obtaining a getaway car. Over several months of surveillance and stalking by the Milano brothers, the Narducci brothers and Ligambi, the victim proved to be a difficult target. After several unsuccessful attempts to kill D'Al-

---

2. Philip Leonetti also attended the meeting but he was not charged in this case.

3. Eugene Milano became a cooperating witness before the jury was sworn and prior to the arraignment of the defendants.

fonso, Scarfo became impatient. Iannarella echoed Scarfo's concern and wanted the killers to work harder.[4]

Ultimately, the killers found their opportunity as D'Alfonso sat outside of a neighborhood delicatessen on a South Philadelphia street corner. The two gunmen, Ligambi and Philip Narducci, jumped out of the car driven by Frank Narducci and fired repeatedly at D'Alfonso, hitting him in the head and body with several bullets. D'Alfonso was murdered on the sidewalk outside of the delicatessen while he was talking to its owner. A young boy was selling "water ices" on the sidewalk in front of the delicatessen, and another boy was also present at the shooting scene. The second boy received minor powder burns from the gun discharges as he ran away from the scene during the shooting. The first boy took cover behind his water ice cart for five to ten minutes after the shooting and then ran from the scene of the crime. The boy who received the burns testified that after the shooting he saw a gunman walk back down an alley adjacent to the scene of the shooting. In a vacant lot situated on this alley, police recovered two guns later identified as being used in the shooting. After the killing Scarfo conducted initiation ceremonies for Ligambi, Philip Narducci and Nicholas Milano.

Prior to their state convictions, the United States Department of Justice successfully convicted these defendants on RICO charges.[5] Initially, the federal government had listed in its indictment the D'Alfonso killing as one of many predicate acts required for RICO convictions. The state trial was originally scheduled to precede the federal trial; however, due to delays chiefly caused by the defendants, the federal trial occurred first. Prior to the federal trial the

4. Salvatore Merlino contends that he did not approve of the murder plan. However, evidence suggests that he aided in the preparation of the plan and did nothing to withdraw from the conspiracy or put a stop to it. He may have been inclined to proceed more slowly than Scarfo wished. Salvatore Merlino told the Milano brothers to stop searching for D'Alfonso since one of the brothers had just received a federal subpoena and federal officials were looking for the other.

5. RICO stands for the Racketeer Influence Corrupt Organizations Act. *See* footnote 18, *infra*.

federal prosecutor deleted the D'Alfonso murder from the indictment as a predicate act so as not to interfere with the state prosecution.

The D'Alfonso murder trial followed the federal RICO proceedings. They were tried before a jury, the Honorable Eugene H. Clarke, Jr. presiding. The selection of the eighteen-member jury spanned three weeks.[6] During voir dire, the potential jurors were questioned about their beliefs regarding the death penalty. Between the selection of the jury and the arraignment of the defendants, Eugene Milano decided to cooperate with Philadelphia, New Jersey and Federal law enforcement officials and testify against his former "family" members.

During the three-week trial, the Commonwealth presented testimony from many sources. Among the people who testified were various police officers who were involved in the investigation of the homicide, police officers who were assigned to monitor LCN figures, a medical examiner, witnesses who observed the events of the day of the shooting and the earlier events concerning the stalking of the victim, and cooperating witnesses Thomas DelGiorno and Eugene Milano. At the close of the trial, the jury returned guilty verdicts on all counts against all defendants.

The next day the trial court held a penalty-phase hearing at which the jury heard the Commonwealth's evidence concerning aggravating circumstances for which the death penalty could be imposed. Judge Clarke, however, removed this issue from the jury upon the defendants' motion. Judge Clarke imposed the mandatory sentence of life imprisonment. Post-sentence motions were filed and denied. This appeal followed.

## II. ISSUES RAISED

In these appeals the defendants have raised a voluminous number of issues. Most parties have adopted by specific and/or general reference the arguments of the other par-

**6.** Six alternates were chosen for the jury.

ties.[7] Also, where issues have been waived by virtue of failure to object contemporaneously at trial, those issues have, for the most part, been raised alternatively in the context of ineffective assistance of counsel claims. On appeal, the following issues [8] have been extensively briefed and, in large part, argued before this panel:

1. Were the appellants' rights under 18 Pa.C.S.A. §§ 110 and 111 violated in that:

 a. the Commonwealth failed to join the instant case with a prior homicide case involving the appellant upon which he was acquitted as required by the state compulsory joinder rule? and,

 b. where a prior federal racketeering prosecution involved an all encompassing conspiracy of which the instant case was a part notwithstanding the government's withdrawal of this predicate act from that federal prosecution prior to trial?

2. Were appellants' rights under the double jeopardy clauses of the federal and state constitutions violated where the Commonwealth and federal government agreed to successively prosecute the appellants thereby increasing the likelihood of conviction and multiple punishment?

3. Whether the incidents of prosecutorial misconduct, viewed as a whole, served to unfairly prejudice appellants in their quest for a fair trial.

4. Whether improper bolstering of the credibility of Commonwealth witnesses compels reversal.

**7.** Prior to oral argument appellant Scarfo moved to adopt by reference the issues raised in Iannarella's brief. At that time we denied that motion. After oral argument and an exhaustive review of the record, we now amend that order and allow Scarfo to adopt these arguments. The issues were not waived, and Scarfo specifically reserved the right to incorporate these arguments in his brief as Iannarella had yet to file a brief. Furthermore, some of the issues adopted by reference have been raised by Scarfo directly in his own brief. We, therefore, shall address the issues in Iannarella's brief as they relate to Scarfo.

**8.** The following list represents a compendium of the issues raised by the six appellants captioned above.

5. Have defendants been deprived of a fair trial where the Commonwealth in its opening speech impeached its own witnesses and then improperly used the unauthenticated testimony of a witness before the grand jury as substantive evidence under the pretext of refreshing recollection of the witness, and where the prosecutor has improperly testified without being sworn?

6. Whether, by introducing facts outside of the record in his summation, and arguing those facts to the jury, the prosecutor denied appellants due process of law.

7. Whether the trial court erred in permitting the prosecutor to raise a negative inference to the jury from the defense attorneys' refusal to commit improprieties in the court.

8. Whether the the trial court erred by failing upon request to charge that circumstantial evidence may be used to acquit as well as convict.

9. Were appellants denied effective assistance by trial counsel's failure to object and/or preserve issues?

10. Did the trial court err in denying appellant's motion to dismiss or for severance because a co-defendant entered a guilty plea after jury selection?

11. Did the trial court err in failing to hold an evidentiary hearing to determine if co-defendant who changed his plea violated the appellants' right to counsel by disclosing defense strategy and confidences?

12. Did the trial court err in permitting the prosecutor to remind the jury of the Eugene Milano's change of plea during his testimony and in closing argument?

13. Did the trial court err in allowing Eugene Milano to testify that he tried to make a deal for his brother who was then on trial with appellants?

14. Did the court err in failing to instruct the jury that Eugene Milano's guilty plea could not be used as evidence against the other men with whom he sat at the commencement of trial?

15. Did the court err in admitting evidence of other crimes, including a 1981 attack on the victim, and testimo-

ny that "made" [initiated] members had to commit murder?

16. Did the prosecutor commit prejudicial misconduct in closing by referring to appellants as a group of criminals?

17. Did the prosecutor commit prejudicial misconduct in closing by referring to appellants as "wolves," "the pack" and a "wolfpack?"

18. Did the court err in permitting ethnic references to "Italian Males" to be used in the place of evidence of guilt?

19. Did the court's charge that the existence of a conspiracy may be inferred from the evidence, circumstances, conduct and relations of the parties violate the due process clause?

20. Did the court err in denying appellants' motion for severance after testimony that co-appellant Scarfo had ordered the 1981 beating of the victim?

21. Did the court err in admitting evidence of a 1981 newspaper article which stated that the victim was the head of Philadelphia's Organized Crime Family?

22. Did the court err in admitting extrajudicial statements against appellant of co-conspirators before determining that there was independent evidence of a conspiracy?

23. Was the extrajudicial statement inadmissible under the Pennsylvania Constitution because the prosecution failed to establish the unavailability of the declarant?

24. Did the Court err in ruling that the prosecution's designation of the charges as capital was legitimate and not a sham?

25. When a court strikes veniremen because they oppose the death penalty but the court did not know if they would be fair at trial, has the court assured a fair and impartial jury?

26. When the Commonwealth knows before voir dire that there is no proof of death penalty aggravating circumstances, does justice require the court to interfere and quash death-qualification voir dire?

27. When trial counsel fails to prevent prejudice, has counsel provided effective assistance by waiving the issue of error caused by improper admission of prior testimony of Margaret Jackson?

28. Was testimony of a State Trooper admissible where he was not qualified as an expert?

29. Should Thomas DelGiorno have been disqualified as an incompetent witness?

## III. STATUTORY AND DOUBLE JEOPARDY BARS TO PROSECUTION

Scarfo, Iannarella, Salvatore Merlino and the Narducci brothers first argue that their prosecutions for the D'Alfonso murder are barred both statutorily and by the constitutional doctrine of double jeopardy.

### A.

 Iannarella argues that the Commonwealth should have joined the D'Alfonso murder trial with the homicide trial for the killing of Salvatore Testa. The Commonwealth's failure to do so, Iannarella contends, acts as a bar to prosecution pursuant to 18 Pa.C.S. § 110.[9] The Common-

9. Section 110 of the Crimes Code addresses prosecutions barred by earlier prosecutions for different offenses. Section 110 provides:
 Although a prosecution is for a violation of a different provision of the statutes than a former prosecution or is based on different facts, it is barred by such former prosecution under the following circumstances:
 (1) The former prosecution resulted in an acquittal or in a conviction ... and the subsequent prosecution is for:
 (i) any offense of which the defendant could have been convicted on the first prosecution;
 (ii) any offense based on the same conduct or arising from the same criminal episode, if such offense was known to the appropriate prosecuting officer at the time of the commencement of the first trial and was within the jurisdiction of a single court unless the court ordered a separate trial of the charge of such offense; or
 (iii) the same conduct, unless:
 (A) the offense of which the defendant was formerly convicted or acquitted and the offense for which he is subsequently prosecuted each requires proof of a fact not required by the other and the law defining each of such offenses is intended to prevent a substantially different harm or evil; or

wealth responds that the issue was waived for failure to raise it in any pre-trial or post-trial motion. However, since this claim has also been raised in the alternative as an ineffective assistance of counsel claim, we must determine whether the contention is of arguable merit. *See Commonwealth v. Durst*, 522 Pa. 2, 559 A.2d 504 (1989) *citing Commonwealth v. Pursell*, 508 Pa. 212, 495 A.2d 183 (1985). Furthermore, counsel for Frank Narducci, Jr. raised this issue on behalf of all appellants in a pre-trial motion to dismiss.[10] There has, therefore, been no waiver of this issue as the Commonwealth contends.

■ Section 110, also known as the compulsory joinder rule, requires that the prosecuting official join together and dispose of all criminal offenses arising out of the same criminal episode in one prosecution. *Commonwealth v. Hude*, 500 Pa. 482, 491, 458 A.2d 177, 180 (1983) *citing Commonwealth v. Beatty*, 500 Pa. 284, 455 A.2d 1194 (1983); *Commonwealth v. Campana*, 455 Pa. 622, 314 A.2d 854 (1974), *cert. den.* 417 U.S. 969, 94 S.Ct. 3172, 41 L.Ed.2d 1139 (1974). The two policies underlying the compulsory joinder rule were clearly set forth in *Hude* as follows:

(1) to protect a person accused of crimes from governmental harassment of being forced to undergo successive

(B) the second offense was not consummated when the former trial began.

(2) The former prosecution was terminated, after the indictment was found, by an acquittal or by a final order or judgment for the defendant which has not been set aside, reversed or vacated and which acquittal, final order or judgment necessarily required a determination inconsistent with a fact which must be be established for conviction of the second offense.

(3) The former prosecution was improperly terminated ... and the subsequent prosecution is for an offense of which the defendant could have been convicted had the former prosecution not been improperly terminated.

18 Pa.C.S. § 110.

**10.** One defendant's counsel may not always raise an issue on behalf of other defendants for the purposes of waiver issues. However, in this case where the eight co-defendants shared an "all-for-one and one-for-all" defense strategy, the raising of an issue by one party for the benefit of the other similarly situated parties allows for a finding that the issue was raised by all.

trials for offenses stemming from the same criminal episode; and

(2) as a matter of judicial administration and economy, to assure finality without unduly burdening the judicial process by repetitious litigation. (citations omitted).

*Hude,* 500 Pa. at 489, 458 A.2d at 180. Difficulties arise in section 110 claims in determining whether certain criminal acts constitute the "same criminal episode." In *Hude,* our supreme court decided that both the "temporal sequence of events" and the "logical relationship between the acts" must be considered when establishing whether a prosecution is barred by section 110. *Id.,* 500 Pa. at 491, 458 A.2d at 181. A court must consider if there is substantial duplication of factual or legal issues in order to determine whether there is a logical relationship between the criminal activities. *Id.,* 500 Pa. at 491–92, 458 A.2d at 181 (quoting Comment, *Commonwealth v. Campana and Section 110 of the Crimes Code: Fraternal Twins,* 35 U.Pitt.L.Rev. 275, 286–87 (1973)).

In this case the criminal episodes bear no logical or temporal relationships with one another. The conception and planning of the D'Alfonso murder did not commence until several months after the Testa shooting. The only connection between the two killings were some of the people charged and their alleged mafia relationships. The facts of the two cases required different proof. The proof was provided in part by different witnesses,[11] and concerned the deaths of different victims in two separate locations. *See Commonwealth v. Purnell,* 358 Pa.Super. 105, 516 A.2d 1203 (1986) (where "acts resulting in separate prosecutions had occurred at different locations, before different witnesses, and involved different victims" separate criminal episodes existed). In addition, a substantial amount of evidence in the Commonwealth's case for the D'Alfonso homicide concerned the stalking of the victim. This evidence was needed in order to identify who the killers were and to corroborate the testimony of "polluted source" wit-

---

**11.** Thomas DelGiorno did testify against the defendants in both cases, however.

nesses. The identification evidence was clearly unrelated in the two cases as the plan to murder D'Alfonso was not formulated until after the Testa homicide. The factual issues of who planned the murder and who stalked the victim are not substantially duplicative and therefore the D'Alfonso case is not logically and temporally related to the Testa case.[12] The two murders were the result of two separate criminal episodes. *Hude,* 500 Pa. at 491, 458 A.2d at 180. The claim that the subsequent prosecution was barred by section 110 is therefore meritless.[13]

### B.

Appellants next raise the issue of whether their trial should have been statutorily barred under 18 Pa.C.S. § 111. Section 111 directs that a Commonwealth prosecution is barred by a former prosecution in another jurisdiction.[14]

12. We note that if the Commonwealth had prosecuted both of the homicides together, the opportunity for confusion of issues by the jury and potential prejudice to the appellants would have been substantial.

13. Since there is no arguable merit to the claim, alternative argument that trial counsel was ineffective for failing to raise this issue is equally meritless. *Durst, supra.*

14. Section 111 states:

When conduct constitutes an offense within the concurrent jurisdiction of this Commonwealth and of the United States or another state, a prosecution in any such other jurisdiction is a bar to a subsequent prosecution in this Commonwealth under the following circumstances:
(1) The first prosecution resulted in an acquittal or in a conviction ... and the subsequent prosecution is based on the same conduct unless:
(i) the offense of which the defendant was formerly convicted or acquitted and the offense for which he is subsequently prosecuted each requires proof of a fact not required by the other and the law defining each of such offenses is intended to prevent a substantially different harm or evil; or
(ii) the second offense was not consummated when the former trial began.
(2) The former prosecution was terminated, after the indictment was found, by an acquittal or by a final order or judgment for the defendant which has not been set aside, reversed or vacated and which acquittal, final order or judgment necessarily required a determination inconsistent with a fact which must be established

Scarfo, Iannarella, the Merlino brothers and the Narducci brothers were prosecuted by the federal government on federal RICO charges prior to the Commonwealth's prosecution.[15] The list of predicate acts used to support the RICO convictions originally contained the D'Alfonso homicide. However, this homicide was dropped as a predicate act prior to the federal trial in order to maintain the D'Alfonso murder as a viable homicide case for the Commonwealth. After the federal trial the defendants were convicted on the RICO charges. The defendants now contend that section 111 bars the D'Alfonso murder prosecution because it concerns a matter that was part of their common and continuing criminal enterprise which was the subject of the federal RICO trial. There are several reasons why defendants' argument lacks merit.

### (i) Burden of Proof

■ Scarfo contends on behalf of the defendants that the burden of proof was on the Commonwealth to establish by a preponderance of the evidence that section 111 did not bar their state prosecutions. In ruling on defendants' pre-trial motions, Judge Clark made a specific, written finding that the double jeopardy issue was frivolous. The Commonwealth argues that this finding relieves it of any burden since the defendants raised a frivolous prima facie case.[16]

> for conviction of the offense of which the defendant is subsequently prosecuted.
> 18 Pa.C.S. § 111.

**15.** Joseph Ligambi was not charged in the federal RICO complaint and, therefore, does not join in this issue.

**16.** The Commonwealth also argues that the defendants waived the issue by their failure to raise it in pre-trial or post-trial motions. We note that *Commonwealth v. Savage*, 388 Pa.Super. 561, 566 A.2d 272 (1989) (discussed, *infra*), the case upon which appellant's burden of proof claim rests, was not filed until November 8, 1989, after the trial had ended. However, Scarfo's post-trial motions were filed on April 13, 1989. He supplemented these post-trial motions on November 10, 1989. Ultimately, Scarfo filed his brief in support of the motions on January 16, 1990. That the initial motions for post-trial relief did not reference the burden of proof argument from *Savage* is understandable because that decision was not yet filed when Scarfo filed his

Thus, we are constrained to review whether Judge Clarke's finding that the defendants raised a frivolous prima facie section 111 claim was erroneous.

■ In *Commonwealth v. Brady*, 510 Pa. 336, 508 A.2d 286 (1986), our supreme court quashed an appeal from an order denying a motion to dismiss the charges on double jeopardy grounds. The supreme court decided that where such an appeal emanates from an order in which the trial court makes a written finding of frivolousness, no appeal at that point is allowed. *Id.*, 510 Pa. at 346, 508 A.2d at 291. However, the double jeopardy issue, even where deemed frivolous by the trial court, is ripe for review in a direct post-trial appeal. *Id.* The *Brady* court's rationale struck a balance between the public's "overriding interest in the prompt trial of the criminally accused" and the individual's expectation of freedom from successive trials without burdening the criminal justice system with dilatory motions to dismiss on the grounds of double jeopardy. *Id.*

■ In *Commonwealth v. Savage*, 388 Pa.Super. 561, 566 A.2d 272 (1989), we stated that:

> original post-trial motions. We are also cognizant that the supplemental motions were filed two days after the *Savage* decision which may not have been enough time to include a supplemental motion based on that case. However, the brief in support of the post-trial motions was not filed until January 16, 1990—over two months after *Savage* was filed. Scarfo could easily have incorporated this discussion in his brief at that point. *Commonwealth v. Gravely*, 486 Pa. 194, 404 A.2d 1296 (1979) (where brief raising issues not presented in post-trial motions was filed and the trial court considered those arguments, issue was not waived).
>
> Also, simply because the *Savage* case had yet to be decided, this did not excuse Scarfo's failure to raise that issue. In *Commonwealth v. Mascaro*, 260 Pa.Super. 420, 394 A.2d 998 (1978) (en banc), this court held that the "Commonwealth ha[d] failed to sustain its burden of [proof]" in a section 111 jeopardy situation. *Id.*, 260 Pa.Superior Ct. at 428, 394 A.2d at 1002. While this case does not explain the rationale or standard of proof, it certainly indicates which party had that burden. Although *Savage* clarified the relative burdens on the parties in a section 111 dispute, we cannot say that the proper allocation of the burden of proof was unknown prior to *Savage*, since *Mascaro*, a 1978 case, states what party has the burden of proof. Scarfo, therefore, could have raised the issue in pre-trial and post-trial motions. After a complete review of the record, we find that the

when a defendant raises a non-frivolous *prima facie* claim that a prosecution may be barred under 18 Pa. C.S.A. § 111, the prosecution bears a burden to prove *by a preponderance of the evidence* either that the "same conduct" is not involved, or that a *statutory exception* to the *statutory bar* on reprosecution applies.

*Id.* at 586, 566 A.2d at 284 (emphasis supplied). Therefore, before the Commonwealth has any burden of proof, the defendant must put forth a non-frivolous prime facie claim that the prosecution may be barred by section 111. In this case, the trial court deemed that the defendants failed to aver a non-frivolous prima facie case that their trials may be barred by section 111.

 While we agree with the trial court in the result it reached regarding the double jeopardy issue, we conclude that the trial court erred in finding frivolous the motion to dismiss.

A frivolous claim is a claim clearly and palpably without merit; it is a claim which presents no debatable question. Such futile claims, presumably interposed for the mere purposes of delay or disruption, are to be expressly identified by the trial court through a written finding. The defendant may then opt to request a stay from the Pennsylvania Supreme Court to preliminarily challenge the trial court's written finding of frivolousness and may secure appellate review of the double jeopardy claim on direct review following retrial.

*Commonwealth v. Gains,* 383 Pa.Super. 208, 217, 556 A.2d 870, 874–75 (1989) (en banc) *citing Brady, supra.*[17] *Gains* was a constitutional double jeopardy case and was not brought pursuant to section 111. We believe, however, that the analysis of the term frivolous in that case is comparable to that which was intended for section 111 claims.

The crux of the defendants' section 111 claim is that the killing of D'Alfonso was part of the overall criminal enter-

burden of proof issue was not raised prior to this disposition and, therefore, it is waived.

**17.** In the present case the defendants were given the opportunity by Judge Clarke to appeal his finding of frivolousness. The defendants filed an appeal but later withdrew it.

prise which constituted the basis for the federal RICO convictions.[18] Confusion over the reach of the tentacles of the RICO statute abounds, and Pennsylvania has only recently addressed the interrelationship of RICO and section 111. In *Commonwealth v. Traitz*, 528 Pa. 305, 597 A.2d 1129 (1991), our supreme court barred a state prosecution under the Corrupt Organizations Act, 18 Pa.C.S. § 911, because the defendants had already been convicted in federal court for RICO violations. The *Traitz* court recognized that the first step in their section 111 inquiry concerned

**18.** The Racketeer Influenced and Corrupt Organizations Act (RICO) provides:

(a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal ... to use or invest, directly or indirectly, any part of such income, in acquisition of any interest in, or the activities of which affect, interstate or foreign commerce....

(b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of an unlawful debt.

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section.

18 U.S.C. § 1962(a)-(d). Section 1961 provides certain relevant definitions for the RICO statute:

(1) "racketeering activity" means any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in narcotic or other dangerous drugs, which is chargeable under State law and punishable by imprisonment for more than one year;

\* \* \* \* \* \*

(4) "enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity;

(5) "pattern of racketeering activity" requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity;

18 U.S.C. § 1961(1), (4), and (5).

whether the conduct for which the Commonwealth sought to prosecute was the same as that which the federal government had already prosecuted. *Id.*, 528 Pa. at 314, 597 A.2d at 1133. Defendants argue that since this homicide was part of the overall RICO scheme, regardless of whether it was included as a predicate act, the federal trial encompassed all of the illegal conduct. The defendants maintain that state prosecution for illicit activities within the scope of the enterprise is therefore barred. As discussed *infra*, this argument lacks merit, but we cannot agree with the trial court that it is frivolous.[19] *Gains, supra.*

We, therefore, must agree with Scarfo's contention that the burden of proof was on the Commonwealth to show that the conduct for which it intended to prosecute was not the same as that for which the defendants were convicted in the federal RICO action. However, the trial court held a hearing on the pre-trial motion and the attorneys for the defendants and the Commonwealth relied principally on the arguments they had given in their briefs related to this motion.

**19.** We note, however, that the trial court may have considered the motion to dismiss frivolous due to the defendants' efforts to orchestrate the litigation to the point where the federal prosecution had to precede the state homicide prosecution. The trial court made no specific findings that this was the reason for its finding; however, the record discloses substantial proof that this delay tactic may have been employed to position the federal trial first. The record reveals that the defense delayed the prosecution for unavailability of counsel, lack of "mental" preparedness on the part of trial counsel for Scarfo due to his busy trial schedule, and opposition to a summertime trial. When the agreed upon date to conduct the trial arrived, the federal case was on trial and the state proceedings once again had to be postponed.

The trial court may have considered that this delay initiated by the defense counsel which allowed the federal prosecution to proceed prompted the double jeopardy and section 111 motion. The trial court never explicitly stated this, nor is it relevant. Though defense counsel's conduct may have been dilatory and calculated to produce a federal trial prior to the state proceeding to test whether the prosecution was barred, the motion to dismiss, at that point in time, was not for the purposes of delay or frivolous in nature. Indeed, the complexities involved in all of the mafia related litigations in both the state and federal courts, required both counsel for the defense and counsel for the prosecutions to coordinate and create strategies for timing the trials. This is why the D'Alfonso homicide was separated from the RICO case at the outset.

Based on these arguments the trial court correctly denied section 111 relief, thus implicitly finding that the Commonwealth had met their burden of proof.

### (ii) Merits of Section 111 Claim

█ In *Traitz,* the Pennsylvania Supreme Court affirmed the section 111 analysis adopted in *Commonwealth v. Abbott,* 319 Pa.Super. 479, 466 A.2d 644 (1983). *Traitz, supra.* The three relevant inquiries necessary to decide whether section 111 is applicable in a given case are as follows:

(1) Is the prosecution the Commonwealth proposes to undertake based on the same conduct for which the individual was prosecuted by the other jurisdiction?

(2) Do each of the prosecutions require proof of a fact not required by the other?

(3) Is the law defining the state offense designed to prevent a substantially different harm or evil than the law defining the other jurisdiction's offense?

*Traitz,* 528 Pa. at 312, 597 A.2d at 1132–33 (citing *Commonwealth v. Abbott,* 319 Pa.Super. 479, 489, 466 A.2d 644, 649 (1983)). Each inquiry, however, need not be addressed. In *Abbott,* we stated:

If we conclude that the subsequent prosecution is *not* based on the same conduct as the federal prosecution, then our analysis is concluded since the statute makes clear that in such situation subsequent prosecution by the Commonwealth is not barred. If, however, we conclude the subsequent prosecution by the Commonwealth "is based on the same conduct" for which appellant was prosecuted by the federal government, the prosecution can proceed only if *both* of the following conditions exist: (1) each of the prosecutions requires proof of a fact not required of the other; and (2) the statute upon which the Commonwealth prosecution is based is intended to prevent substantially different harm than is the federal statute ... It would seem that an affirmative answer to the initial inquiry lowers the bar to the subsequent prose-

cution and that only an affirmative response to *both* of the remaining inquiries can lift the bar.

*Abbott,* 319 Pa.Super. at 488–89, 466 A.2d at 649 (emphasis supplied). *See also Commonwealth v. Wetton,* 405 Pa.Super. 1, 6, 591 A.2d 1067, 1070 (1991). Thus, as stated earlier, we must first decide whether the conduct relevant to the D'Alfonso homicide was the same as that for which the defendants were prosecuted in the federal RICO action. *Traitz, supra; Abbott, supra.*

In *Mascaro* we defined the term "the same conduct" to mean "any and all criminal behavior committed in support of a 'common and continuing scheme.'" *Mascaro,* 260 Pa.Super. at 427, 394 A.2d at 1001. *See also Abbott,* 319 Pa.Super. at 493, 466 A.2d at 652. Otherwise, prosecutions would be barred by section 111 "only where exact crimes match exact dates—crime for crime and date for date." *Mascaro,* 260 Pa.Super. at 427, 394 A.2d at 1001. The defendants in *Mascaro* were charged with federal crimes under the mail fraud statute and making false statements in violation of 18 U.S.C. § 1001, and with the state charges of theft by deception, deceptive business practices, and unsworn falsification to authorities, as well as criminal conspiracy in connection with a contract whereby defendant was to haul trash for Delaware County. We concluded that the Commonwealth prosecution arose from the same conduct as that prosecuted in the former federal action. Thus, the bar to prosecution in the Commonwealth was lowered. *Mascaro,* 260 Pa.Super. at 427–28, 394 A.2d at 1001–02, *Abbott,* 319 Pa.Super. at 491, 466 A.2d at 649. The *Mascaro* court also concluded that the statutes protected the same interests and, thus, the bar remained to state prosecution. *Mascaro,* 260 Pa.Super. at 427–28, 394 A.2d at 1001–02.

In other cases we have barred subsequent Commonwealth prosecutions where the same type of criminal conduct occurred at different points in time but constituted the same type of criminal transaction. *See, e.g., Savage, supra* (state trial barred where Commonwealth did not prove criminal conduct of conspiracy was different from that

conspiracy for which appellant was tried in federal court); *Abbott, supra* (Commonwealth trial barred where doctor, charged with violations of state and federal drug distribution laws for the same criminal episodes, and federal trial resulted in conviction). As we have stated, in *Traitz* the Supreme Court of Pennsylvania barred Traitz's state prosecution of charges brought pursuant to the Corrupt Organizations Act ("COA"), 18 Pa.C.S. § 911. Traitz had already been tried in the federal court for RICO violations which resulted from the same course of conduct. After examining the RICO and COA statutes, the supreme court declared:

> The RICO Act and COA target organized crime that surfaces by varying patterns of illegal conduct, recognizing that the money and power obtained by organized crime are used to subvert legitimate businesses. *It is the course of illegal conduct, not the underlying individual criminal acts, that are the focus of the two statutes.* The conduct to be examined, therefore, is the conduct of an individual evincing a pattern of racketeering activity. The significance lies not with the individual offenses culminating in the pattern of racketeering activity, but in the scheme that is promoted by the pattern of racketeering activity.

*Traitz,* 528 Pa. at 313, 597 A.2d at 1139 (emphasis added). It is clear from this passage that the underlying predicate crimes in a RICO action, or alternatively a COA matter, are distinguishable offenses from the violation of RICO, or COA, itself. Further support for this proposition is found in *United States v. Turkette,* 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981), where the United States Supreme Court stated:

> RICO imposes no restrictions upon the criminal justice systems of the States. See 84 Stat. 947 ("Nothing in this title shall supersede any provision of Federal, State, or other law imposing criminal penalties or affording civil remedies in addition to those provided for in this title"). Thus, under RICO, the States remain free to exercise

their police powers to the fullest constitutional extent in defining and prosecuting crimes within their respective jurisdictions. That some of those crimes may also constitute predicate acts of racketeering under RICO, is no restriction on the separate administration of criminal justice by the States.

*Id.* at 586 n. 9, 101 S.Ct. at 2530 n. 9.

■ Turning to the facts of this case, we first acknowledge that the D'Alfonso homicide was deleted from the RICO indictment as a predicate act in the federal case.[20] The facts of this murder case had, therefore, never been litigated. The sole overlapping conduct or testimony in the two cases was the alleged organized crime connection, in particular the Philadelphia family, the purpose of which was to illustrate the motive for the murder. The conduct in the RICO case concerned numerous other acts of racketeering which in no way were related to this case. The conduct in the murder case concerned the planning, stalking, and eventual execution of Frank D'Alfonso. To reiterate, when addressing issues of organized crime pursuant to RICO, "[i]t is the course of illegal conduct, not the underlying individual criminal acts" which are the subject of the inquiry. *Traitz*, 528 Pa. at 313, 597 A.2d at 1133.[21]

Although the acts of certain participants were motivated by links to and a desire to stay in good standing with LCN, these circumstances do not require that the murder prosecution be barred by section 111. It is clear that RICO cases

**20.** The Federal Rules of Criminal Procedure allow the attorney representing the federal government "by leave of court [to] file a dismissal of an indictment, information or complaint and the prosecution shall thereupon terminate." F.R.Crim.P. 48(a). The record supports the conclusion that the deletion of the D'Alfonso homicide as a predicate act to RICO was in accord with the federal rules. Thus, the activities conducted in pursuit of the D'Alfonso homicide were not tried in federal court.

**21.** Indeed, RICO cases by their very nature are enterprises where illegal activities are used to create wealth. However, this does not mean that all events and conduct relevant to members of the enterprise are in furtherance of or necessarily aid the enterprise. Conduct among the members of the enterprise may be unrelated or tangentially related to the activities of the enterprise but may still be illegal.

are meant to deter enterprises from corrupting and gaining influence through illegal activities, thus affecting interstate commerce. The record in this case reveals no link to protecting interstate commerce from the burdens of racketeering. Instead, the evidence presented exhibited a motive to kill based on vengeance, vindictiveness and maliciousness. While these motives may certainly be present in a RICO case, in this case Scarfo's cold command sprang from jealousy and envy due to the recognition—though flawed—that D'Alfonso had become the Philadelphia crime family's boss. Indeed, D'Alfonso was not even a member of LCN, and no evidence suggested that he posed an economic threat to the enterprise or that he vied for Scarfo's position as the leader of the family. Therefore, the conduct which formed the basis of the state prosecution was not "based on the same conduct for which the [defendants were] prosecuted by the [federal] jurisdiction." *Traitz*, 528 Pa. at 312, 597 A.2d at 1132–33 (citing *Abbott*, 319 Pa.Super. at 489, 466 A.2d at 649).[22]

22. Although there is no need for a discussion of the final two questions of the section 111 analysis, *see Traitz, supra; Abbott, supra*, we will address them briefly to complete the analysis. We begin by recognizing that each prosecution requires proof of a fact not required by the other. The federal trial required proof of an enterprise. *See* footnote 18, *supra*. The Commonwealth trial required no such proof. The Commonwealth had to prove the existence of a conspiracy and the fact that D'Alfonso was murdered. The existence of a criminal conspiracy to commit murder may be different than the existence of an enterprise. *See Wetton*, 405 Pa.Super. at 1, 591 A.2d at 1073 (existence of criminal enterprise is immaterial to conspiracy charge). Also, the proof of the murder, if not a predicate act in the federal case, is not relevant to the federal case. The murder was deleted from the federal RICO charge and, thus, the two cases required different facts to be proven. *Traitz, supra; Abbott, supra*.

Finally, the laws defining the two offenses address substantially different harms or evils. In *Turkette*, the United States Supreme Court declared that "the primary purpose of RICO is to cope with the infiltration of legitimate businesses." 452 U.S. at 591, 101 S.Ct. at 2533. RICO was, therefore, designed to stop criminal enterprises from entering the sphere of legitimate businesses by exerting power through illegal means. Murder, however, was made a crime to deter physical invasions against individual citizens and protect the public safety. Thus, the purposes and evil for which the two crimes were created are distinct. *Traitz, supra; Abbott, supra*. Because the separate charges in the Commonwealth met the requirements of the two

C.

 The defendants also contend that their state trial was barred by the constitutional doctrine of double jeopardy. In order to resolve a double jeopardy question, we turn to the two-prong test articulated in *Grady v. Corbin*, 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990).

The first inquiry requires us to identify the statutory elements of each crime. This aspect of the analysis is known as the *Blockburger* [*Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932)] test. If one of the offenses is a lesser included offense or if the prosecution is not required in the subsequent prosecution to prove elements which are different from those in the prior prosecution, then *Blockburger* bars the subsequent prosecution.

Where the *Blockburger* test does not bar a subsequent prosecution, *Grady* instructs us to make a second inquiry to determine "[whether] the government, to establish an essential element of the offense charged in [a subsequent] prosecution, will prove conduct that constitutes an offense for which the defendant has already been prosecuted". *Id.* Where the government relies on the same conduct for the prior and subsequent prosecution, double jeopardy bars the subsequent prosecution. While the first inquiry focuses on the elements of the offenses, the second focuses on the conduct necessary to prove each offense.

*Commonwealth v. Bellezza*, 412 Pa.Super. 469, 483, 603 A.2d 1031, 1039 (1992). Our resolution of the section 110 and 111 claims address the requirements of the two-prong *Grady* test and we, thus, rely on that discussion to support our determination that defendants' double jeopardy claims are meritless.

## IV. DEATH–QUALIFIED JURY

The defendants next raise issues concerning the jury selection which involved "death-qualifying" the chosen jury.

final *Traitz–Abbott* inquiries, the defendants claim of bar under section 111 lacks merit. *Id.*

A death-qualified jury is one in which the venire persons are questioned regarding the situation where, if given the appropriate law to follow, they could evaluate the facts of a first-degree murder case and potentially impose a sentence of death. The defendants essentially contend that the trial court should not have allowed the prosecution to seat a death-qualified jury because the Commonwealth knew or reasonably should have known prior to jury selection that there were insufficient aggravating circumstances to warrant choosing a jury capable of imposing the death penalty. They argue further that they were denied a fair and impartial jury by the trial court's excusing for cause potential jurors who indicated a disbelief in or an inability to render a sentence of death.

The defendants did not receive the death penalty. Judge Clarke, after the Commonwealth presented its evidence at the penalty phase hearing, granted the defendants motion to take the death sentence out of the purview of the jury because the Commonwealth failed to show aggravating circumstances necessary to warrant imposition of such an extreme sentence. The defendants contend, however, that they were prejudiced by the death-qualification of the jury due to their belief that a death-qualified jury for sentencing is more prone to find against an accused in the guilt phase of a trial.

## A.

We shall first address the issue of whether the death-qualification of the jury constituted a sham in that the prosecution knew or reasonably should have known that the aggravating factors were insufficient to warrant imposition of the death penalty.

Salvatore Merlino contends that defendants' joint pre-trial motion to dismiss the capital offense elements of the charges was not intended to force the Commonwealth to elect whether this case was capital. Instead, he argues that the motion was intended to seek the trial court's interven-

tion and determination on whether there was a potential death penalty issue in this case. This argument, however, lacks merit. The trial court has no standing to make such a determination.[23] In *Commonwealth ex rel. Fitzpatrick v. Bullock*, 471 Pa. 292, 370 A.2d 309 (1977), our supreme court held that "the *initial* determination of the presence or absence of aggravating ... circumstances in a jury trial for murder be made *by the jury* after it has convicted the defendant of murder in the first degree." *Id.*, 471 Pa. at 303, 370 A.2d at 314 (first emphasis added; second emphasis in original); *see also Commonwealth v. Tomoney*, 488 Pa. 324, 412 A.2d 531 (1980) (since trial court may not make pre-trial determination whether case is capital or non-capital, it cannot force prosecutor to make an election as to whether case is capital or not; determination of whether case is capital is a jury function). Thus, Salvatore Merlino's argument must fail since the trial court was powerless to make such a decision at that point in the proceedings. *Bullock, supra.*

Furthermore, the Commonwealth could certainly have approached this case as capital allowing for a death-qualified jury. In *Commonwealth v. Kingsley*, 480 Pa. 560, 391 A.2d 1027 (1978), our supreme court was faced with determining whether it was appropriate to question venire persons about their willingness to impose a verdict which would require a sentence of life imprisonment.[24] The court stated:

**23.** At this point we must consider Rule 352 of the Pennsylvania Rules of Criminal Procedure. Rule 352 requires the Commonwealth to notify the defendant, at or before arraignment, of any aggravating circumstances it intends to offer at the sentencing hearing, unless the Commonwealth attorney does not become aware of the information until after the arraignment or the trial court extends the time for cause shown. Pa.R.Crim.P. 352. The rule, however, applies to cases in which arraignment occurred on or after July 1, 1989. In the present case defendants were arraigned in March of 1989, well before the effective date of Rule 352. Therefore, we shall address notions of trial court error pursuant to the procedures and law employed prior to the effective date of Rule 352.

**24.** *Kingsley* was decided during the period after the death-penalty was declared unconstitutional and prior to the United States Supreme

the Commonwealth believed that its evidence could support a finding of murder of the first degree.... We can find no reversible error in allowing the question concerning the imposition of a life sentence.

*Id.*, 390 Pa. at 573, 391 A.2d at 1033–34. We therefore conclude that death-qualification of the jury is appropriate where a person is tried for first-degree murder and the Commonwealth reasonably believes there to be aggravating factors at the voir dire.

■■■ We now turn to the question of whether aggravating factors existed. It is an aggravating factor to commit an offense where "the defendant knowingly created a grave risk of death to another person in addition to the victim of the offense." 42 Pa.C.S. § 9711(d)(7). It is clear from cases decided by our supreme court that the other persons need not suffer actual harm, however, they must be subjected to grave risk. *See, e.g., Commonwealth v. Morris*, 522 Pa. 533, 564 A.2d 1226 (1989) (life endangered where bystander hid under vehicle and emerged uninjured after shooting); *Commonwealth v. Logan*, 519 Pa. 607, 549 A.2d 531 (1988) (appellant caused grave risk of death to others where he killed victim with ax on public bus; other passengers rushed to doors to escape threatening situation; no other injuries); *Commonwealth v. Smith*, 518 Pa. 15, 540 A.2d 246 (1988) (appellant caused grave risk of death to other innocent persons where several people were standing

Court and our legislature's allowing the death sentence once again. We note that life imprisonment was the most severe sentence at that time and was mandatory for a first-degree murder conviction. While we understand that the imposition of the death sentence is a far more harsh penalty than life imprisonment, the *Kingsley* court's analysis of "life-qualifying" the jury well supports our analysis here on death-qualification.

We also note that the procedural posture of the "life-qualifying" in *Kingsley* arose in a similar fashion to that which we face in this case. In *Kingsley* the trial court sustained a demurrer to murder in the first degree. 480 Pa. at 573, 391 A.2d at 1033. The jury, thus, never was daunted by the prospect of having to render a life sentence. In the present case Judge Clarke sustained a motion to take the death-penalty issue away from the jury. Therefore, while hearing evidence about whether to impose the death penalty, the jury persons were never faced with actually having to sentence defendants to death.

on a porch close to victim; these people could have been struck by a ricochet, "passed through" bullet, or missed shot); *Commonwealth v. Griffin*, 511 Pa. 553, 515 A.2d 865 (1986) (defendant knowingly created grave risk of death to others when he shot victim once in the head at party; no others injured), *cert. denied*, 480 U.S. 940, 107 S.Ct. 1590, 94 L.Ed.2d 779 (1987).

Based upon section 9711(d)(7) of the Judicial Code and the supreme court's decisions, the Commonwealth in this case could reasonably have believed that this was a first-degree murder case, worthy of death-qualification. At the scene of the shooting outside of a neighborhood delicatessen, there were several people present and in close proximity to the gunmen. One was a thirteen year old boy, Frank Brocco. One of the assailants was so close to Brocco that he received powder burns from the material discharged by the assailant's gun. Another boy, Paul Maranca, hid under a water ice cart in front of the store for as many as ten minutes after the shooting before fleeing uninjured. *See Morris, supra.* Alex Marsella, the store's proprietor, was near the victim at the time of the shooting as well; he, too, fled after hearing a shot. *Logan, supra.* Testimony also revealed that Mr. Marsella's daughter-in-law was inside the store, tending to business, and that there were other children within the proximity of the store. Any one of these people, particularly Marsella, Brocco and Maranca, were potential victims of the shooting spree.

The testimony revealed that Marsella, Brocco and Maranca each were close enough that a missed shot or a bullet which passed through the body of D'Alfonso could also have struck any of these people. *Smith, supra.* It is also worthy of mention that Brocco, who was familiar with guns, testified to hearing six shots. Only fragments from three bullets were recovered and just one of these came from the body of D'Alfonso. The defendants, having targeted their victim, disregarded the grave risk of death they created to each one of the bystanders in the vicinity. The Commonwealth could therefore reasonably have believed that there were aggravating factors for death-qualifying the jury.

*Morris, supra; Logan, supra; Smith, supra; Griffin, supra.* Even though the sentencing court did not allow the death penalty issue to reach the jury, the Commonwealth could have reasonably believed, based upon the information they knew prior to voir dire, that there existed a potential for imposition of capital punishment.

■■■ The defendants' contention that the death-qualification was a sham in order to seat a more conviction-prone jury is equally meritless. Our supreme court has considered and rejected this issue in cases where appellants raised the issue of conviction-prone juries in death penalty cases. *See Commonwealth v. Strong*, 522 Pa. 445, 563 A.2d 479 (1989), *cert. denied*, 494 U.S. 1060, 110 S.Ct. 1536, 108 L.Ed.2d 775 (1990); *Commonwealth v. Hughes*, 521 Pa. 423, 555 A.2d 1264 (1989); *accord Lockhart v. McCree*, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). Accordingly, we must reject this argument.

### B.

■■■ The defendants also contend that there were several jurors who were struck for cause merely because they were in opposition to the death penalty or did not feel they could impose that sentence. The defendants argue that the trial court erred in granting these strikes for cause because the the result was a conviction-prone jury. As we have just determined in part IV(A), our supreme court has already addressed and rejected this argument. *Strong, supra; Hughes, supra.* We, therefore, find that the trial court committed no palpable error by excluding jury members who indicated disdain for the death penalty. *Commonwealth v. Lane*, 521 Pa. 390, 555 A.2d 1246, 1249–50 (1989) (decisions regarding the striking of venire persons rests in the sound discretion of trial judge and will not be overturned absent a palpable error).

### V. EUGENE MILANO'S PRE–TRIAL CHANGE OF PLEA

The defendants raise various issues concerning Eugene Milano's change in plea and decision to cooperate with the

Commonwealth. This occurred immediately prior to the commencement of trial. Eugene Milano (Eugene or "Gino") was a defendant in this case prior to his change in plea and was seated with the defendants during the voir dire and selection of the jury. The Commonwealth announced, in a courtroom cleared of the jury and public, Eugene's intention to change his plea on the morning of March 15, 1989, after the jury had been selected and on the day opening arguments were set to begin. Barbara Christie, the Commonwealth prosecutor who handled Milano's "flip," stated "Eugene Milano very recently contacted law enforcement who advised me, most recently, of Milano's wish to cooperate and to speak to law enforcement agents...." The court granted a twenty-four hour recess for the Commonwealth to interview Milano and for defense counsel to consider this unexpected change in circumstance.

On March 16, 1989, when court reconvened, the defendants moved for a dismissal of the charges based on Eugene Milano's invasion of the defense camp. Scarfo's attorney, Robert Simone, who argued on behalf of all defendants, stated that the newspapers were reporting that the negotiations with Milano had been on-going for "the past two weeks." He indicated that Milano had access to defense reports and investigative reports. On appeal, the defendants allege that Milano had access to defense strategy planning.

At argument on this motion, no request for a hearing was made and, upon the trial court's offer to give a cautionary instruction to the jury regarding the "flip," Simone declined, stating that he did not want to remind the jury that Milano had been seated with the defendants earlier. The prosecutors requested a cautionary instruction because they suspected that case law required as much. The trial court, however, considered the concern addressed by defendants' waiver and decided that it might give such an instruction when Milano testified. No instruction was given, however, until the charge to the jury. Furthermore, no request for a hearing was ever made. The trial judge also warned the

Commonwealth not to remind the jury that Milano was seated at the defense table earlier.

During the trial, the expected testimony came in regarding the change in plea and its circumstances. In the opening statements no remarks were made regarding the fact that Milano was seated with defendants during voir dire, but the Commonwealth did question him about the change in plea and mentioned that he sat with defendants earlier. Again, the Commonwealth made mention of this in the closing arguments. However, at no point was an objection made by the defense.

The defendants argue that the trial court should have granted their motion to dismiss after the change in plea because Eugene had been aligned with the defense camp, knew their strategies, and had participated in jury selection. They also argue that the trial court should not have allowed the prosecutors to remind the jury of Eugene's change in plea during the course of the trial. The trial court's decision to allow Eugene to testify about asking the government to make a deal for his brother, who was still a defendant in the case, is also raised by the defendants as trial error. Ligambi raises several of these arguments alternatively as ineffective assistance of counsel claims. Defendants have not listed any specific prejudice they may have suffered other than that Milano was privy to defense strategies in general.

A.

 First, defendants argue that the trial court erred in failing to dismiss the charges against them after Eugene changed his plea and testified. The defendants argue that when the Commonwealth reminded the jury of Eugene's change in plea and that he had been sitting with the defendants "a couple of weeks ago" (during jury selection), they were prejudiced to the extent that a dismissal was warranted. Had the trial judge not properly instructed the jury that guilty pleas of a co-defendant cannot be used to establish the guilt of a defendant on trial, then the defen-

dants argument would have merit. However, the trial court appropriately instructed the jury on the correct legal standards. *See* section VII of this opinion, *infra.*

In *Commonwealth v. Geho*, 223 Pa.Super. 525, 302 A.2d 463 (1973) (en banc), two defendants in a three defendant case entered pleas of guilty during the trial and in the presence of the jury. After the plea the court cautioned the jury that this change of plea could not be used against the remaining defendant as evidence of his guilt. This court en banc affirmed the conviction of the third defendant deciding that in such a case, where appropriate jury instructions are given, a conviction may stand. 223 Pa.Super. at 530, 302 A.2d at 466.

Here, Eugene Milano never stood trial before this jury, but the jury was well aware of the fact that Gino was a co-defendant prior to his plea; he sat with the defendants during the jury selection, and, if that did not alert the jury to his former status, then defense counsels' and the prosecutors' reminders must have. We note that both the prosecution and the defense questioned Eugene at length about the change in plea and that the defense did not object when the prosecution reminded the jury that Eugene had been a defendant two weeks earlier. However, the trial judge adequately and accurately instructed the jury that the burden was still on the Commonwealth to prove guilt beyond a reasonable doubt and that Eugene's plea could not be used against the remaining defendants. The trial court, therefore, correctly denied the motion to dismiss. *Geho, supra.*

### B.

Next, defendants argue that the trial court erred in allowing the prosecution to remind the jury about the change in plea and that Eugene had been a defendant. Appellate counsel relies on *Geho* to support this argument. Our discussion of the denial of the mistrial, *supra* at V(A), addresses this contention. Accordingly, this claim lacks merit. To the extent the defendants raise the claim as

ineffectiveness for failure to object, we must find that contention meritless as well. *Durst, supra.*

## C.

■■■ A third allegation of error by the trial court was that it allowed Eugene to testify regarding his discussions with the authorities about a plea arrangement for Nicholas Milano, his brother. Defendants argue that this violates *Geho*, which instructs that a proper, clear jury instruction is meant to avoid the possibility of guilt by association. Again the jury instruction referred to in the preceding discussions cured any prejudice which defendants may have faced by Eugene's testimony relevant to his brother Nicholas. The charge required that each defendant be found guilty beyond a reasonable doubt based on the evidence presented against him. Therefore, this claim is meritless.

## D.

Finally, among the issues defendants raise related to Eugene Milano's change in plea, defendants argue that his change in plea may have resulted in the Commonwealth's intrusion into the defense's strategies, constituting a violation of their sixth amendment right to counsel. Essentially, defendants argue that since the newspapers were reporting that Eugene had been negotiating a plea bargain for two weeks, the Commonwealth could have kept him with the defense for the purposes of ascertaining defense trial strategies and other information. The record reveals that Eugene's attorney did not participate in, nor was he aware of, the plea negotiations. Defendants simply do not know the reason for the delay or even if there actually was a delay in accepting and/or negotiating the change in plea. They aver that the trial court should have held a hearing to determine these issues and that their attorneys were ineffective for failing to request such a hearing.

This issue is of particular concern to us. The allegations go to the heart of due process and fairness. At the outset we are mindful that, in order to prosecute certain cases,

there is a need for the Commonwealth to use witnesses who were members of a criminal conspiracy. Secondly, it is not unusual for a defendant to change his plea midway through a trial. It is less usual, however, for that defendant to then become a cooperating witness; though, it is certainly not illegal provided that the rights of the remaining defendants to be tried are not infringed. Unfortunately, such infringement occurred in this case. Since this is an issue of first impression in our Commonwealth, we turn to non-binding federal decisions to guide us in our analysis.

In *United States v. Rispo*, 460 F.2d 965 (3d Cir.1972), the Court of Appeals for the Third Circuit reversed a conviction against appellants because of an intrusion into the defense camp where trial strategies were discussed. In that case a paid government informant was charged along with Rispo for engaging in a conspiracy related to interstate goods. The informant, who had retained his own trial counsel, sat with the defendants through a joint trial. After the jury returned verdicts against Rispo and the government informant, the United States Attorney informed the court of the paid informant and recommended granting a motion for acquittal. This motion was granted. Rispo argued that regardless of whether information was obtained by the intrusion into the defense and was transmitted to the government, they were entitled to a new trial.

The court of appeals rejected a *per se* rule that governmental intrusion into the defense camp compels a new trial. Instead, the court opined that where there is a very real likelihood of prejudice, the need to eliminate such prejudice requires reversal. *Id.* at 977. The *Rispo* court concluded that where the prosecutors knowingly acquiesced in the deception to the jury, a new trial was warranted. *Id.*

The Court of Appeals for the Fifth Circuit has espoused a different standard. Where appellants raise the issue that the government was privy to defense strategy, they must elicit some "actual prejudice resulting from [the witness'] supposed knowledge of defense strategy, or that [the witness] communicated such knowledge to the government."

*United States v. Kilrain,* 566 F.2d 979 (5th Cir.1978) *cert. denied* 439 U.S. 819, 99 S.Ct. 80, 58 L.Ed.2d 109 (1978). In *Kilrain,* a former government informant after unsuccessfully negotiating a plea agreement, pled guilty two days into the trial in which he was a co-defendant. He then testified at trial, but did not relate any of the information regarding any of the evidence obtained through his former paid informant status. The court affirmed the co-defendants' convictions because they failed to show any prejudice resulting from the informant's testimony.

The United States Supreme Court has also considered the issue of the right to counsel in the context of intrusion into the defense camp in a civil context. In *Weatherford v. Bursey,* 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977), the Supreme Court considered a civil rights action brought pursuant to 42 U.S.C. § 1983 for governmental intrusion into defense strategies affecting the constitutional right to representation by counsel. Weatherford, an undercover detective, met with plaintiff Bursey and his attorney prior to Bursey's criminal trial to discuss the trial. Weatherford was arrested and charged along with Bursey so as not to reveal his cover. The trial court found that "[a]t no time did Weatherford discuss with or pass on to his superiors or to the prosecuting attorney or any of the attorney's staff 'any details or information regarding the plaintiff's trial plans, strategy, or anything having to do with the criminal activity pending against plaintiff.'" *Id.* at 548, 97 S.Ct. at 840 (quoting the District Court opinion). Weatherford did testify against Bursey in the criminal proceeding, though Bursey did not know this would happen until the day of the trial.

The Supreme Court decided that the plaintiff's constitutional rights were not violated. However, it also stated that Bursey would have had a much stronger case if:

Weatherford testified at Bursey's trial as to the conversation between Bursey and Wise [Bursey's attorney]; [ ] any of the State's evidence originated in these conversations; [ ] those overheard conversations [had] been used

in any other way to the substantial detriment of Bursey; or even [ ] the prosecution learned from Weatherford, an undercover agent, the details of the Bursey–Wise conversations about trial preparations. . . .

*Id.* at 554, 97 S.Ct. at 843. Although the Court found that none of these factors existed, it indicated that it would be appropriate to weigh these factors in determining the prejudicial nature of the intrusion. *Id.*

In *United States v. Morrison,* 449 U.S. 361, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981), the appellant, who was charged with federal drug offenses, was approached by agents of the Drug Enforcement Agency who knew she had retained counsel. The agents sought her cooperation in an investigation related to the one for which she was charged. The agents made disparaging remarks about her attorney and told her that if she cooperated she would benefit, but if not, she would face a lengthy jail term. Later the agents visited Morrison again, without her counsel present, but she never agreed to cooperate, nor did she incriminate herself or supply any information related to her case. Morrison sought dismissal of her indictment on charges that the agents had violated her sixth amendment right to counsel. The Supreme Court held that "absent demonstrable prejudice, or substantial threat thereof, dismissal of the indictment is plainly inappropriate, even though the violation may have been deliberate." *Id.* at 365, 101 S.Ct. at 668 (footnote omitted).

▮ Addressing ourselves to the present case, we must consider what standard to adopt for courts to apply in this Commonwealth when reviewing claims of violations of the sixth amendment right to counsel in the context of an "intrusion into the defense camp" argument. The Commonwealth insists that defendants have not been prejudiced by any potential defense intrusion. They also assert that there was no such intrusion. After much consideration we adopt the "likelihood of prejudice" standard set forth by the Court of Appeals for the Third Circuit in *Rispo* in order to address

claims of defense camp intrusions where, as here, the intrusion proceeds as far as it did in this case.

Our analysis must start with an examination of the sixth amendment right to counsel. Both the United States and the Pennsylvania Constitutions guarantee the right of counsel to the accused in criminal proceedings. U.S. Const. 6th amend.; Pa. Const. Art. I, Section 9. The United States Supreme Court has further stated that in order to realize the purposes of the constitutional guarantee of counsel, an accused is entitled to effective representation by that counsel. *Powell v. State of Alabama*, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932); *accord Commonwealth ex rel. Washington v. Maroney*, 427 Pa. 599, 235 A.2d 349 (1967). Any criminal justice system must recognize that privacy in communications between the accused and his or her lawyer is necessary to effectuate the right to effective assistance of counsel. *See* Note, *Government Intrusions into the Defense Camp: Undermining the Right to Counsel*, 97 Harv. L.Rev. 1143 (1984) [hereinafter, *Government Intrusions* ]. The purpose of privacy in these communications between counsel and client is to promote detailed and candid conversations thus providing a starting point for effective representation.

When the government has access to information discussed by the accused and defense counsel, the potential for devastation to the effective representation of the accused becomes quite real. This is particularly true in a case involving many defendants such as the case here. "[I]n complex, multi-defendant trials ... group consultation may be the key to preparing an effective defense." *Government Intrusions, supra* at 1146. The possibility that intrusions may occur heightens when multiple parties are the subject of a group defense. In such a case it would be reasonable for a defendant to assume that the other defendants are allied with him or her and that the confidentiality of statements made for the benefit of group preparation would stay confidential within the group until the appropriate time for disclosure, perhaps at trial. "Defendants have

both the right to prepare a group defense and the right to communicate privately with .counsel; constitutional principles forbid requiring a defendant to waive one of these rights in order to exercise the other." *Id.* at 1147. Thus group defense preparations do not require special protections aside from those necessary in a single defendant situation. Rather, they require, like the single defendant situation, assurances that no government intrusions into the defense camp will occur.

 Turning to the present case, whether the Commonwealth actually became privy to any defense strategies or secret information is inconsequential for purposes of our review. The late notice of the change in plea along with the suggestions by defense counsel that reports indicated plea negotiations between government agents and Eugene Milano had been on-going for approximately two weeks raised a sufficient inference to warrant a finding that an intrusion may have occurred. Because Eugene had been seated with the defendants during the jury voir dire, he was exposed to the defense strategies in securing a desirable jury as well as to those decisions regarding potential defense positions on any matters discussed immediately prior to trial. Eugene may have had information on—or insight into—who would testify, the scope of any such testimony, whether a defense would be presented and what that defense would entail, the evidence to be elicited from Commonwealth witnesses on cross-examination, and any other potential issue which may have arisen during the prosecution of the action. Any or all of this information may not have been known to the prosecution prior to the change in plea. However, the failure of the Commonwealth, at any point, to satisfactorily describe or aver that they had created some sort of separation between the agents and prosecutors handling the change in plea and those trying the case indicates to us that a strong potential for information exchange was possible, if not probable. After Eugene Milano's change in plea and cooperation with the prosecution, however, the potential for

disclosure became a direct peril to the remaining defendants standing trial.

There is simply no way to resolve whether defendants in fact were prejudiced by intrusions into the defense camp. We are persuaded by the Third Circuit's proclamation in *Rispo* that a new trial is warranted where there is a very real likelihood of prejudice to the defendant. Recognizing that the *Rispo* court had before it an extreme situation, where the informant was known to the prosecutors during the prosecution and the informant sat as a defendant during the entire prosecution, we nonetheless hold that there was a very real likelihood of prejudice to the defendants since Eugene Milano was an important part of the case up to the point of opening arguments. We reiterate that the "eleventh hour" change in plea caused the appearance that substantial due process violations may well have occurred. In this situation we must not delve into a process whereby we attempt to balance the prejudice to the defendants caused by the intrusion against the right to effective assistance of counsel. We agree with the *Rispo* court's determination that

> [w]hile it is not necessary to lay down a rigid standard of prejudice *per se*, it is well to keep in the mind the view expressed in *Glasser* [*v. U.S.*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680], that "the right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial."

460 F.2d at 977 (quoting *Glasser v. United States*, 315 U.S. 60, 76, 62 S.Ct. 457, 86 L.Ed. 680 (1942)). While it is entirely possible that no strategic defense information was relayed by Eugene Milano to the prosecution, we must reconcile this uncertainty in favor of the notion that courts must do what is just, but also courts must maintain the appearance of justice. *See Rispo*, 460 F.2d at 977. Were we not to presume a very real likelihood of prejudice, the process assuring free and unfettered communication between lawyer and client, particularly in a multi-defendant

case, would be jeopardized. We cannot allow the constitutional mandate of effective assistance of counsel to suffer under these compelling circumstances, even in the absence of a showing of actual prejudice. We, therefore, adopt the standard applied in *Rispo* and hold that, in this case, there was a very real likelihood of prejudice to the remaining defendants caused by the events involving the change in plea of Eugene Milano.

 Having determined that a very real likelihood of prejudice was created by the presumed intrusion into the defense camp,[25] we must now fashion an appropriate remedy.

**25.** We note that we are not presuming that there was a fraud on the court. Indeed, the evidence does not support such a conclusion. Rather, we find that the change in plea, in addition to the cooperation of Eugene Milano, effected a very real likelihood of prejudice because of an apparent intrusion into the defense camp. We are not concerned, for the purposes of this case, whether or not there was an actual intrusion. The change in plea and resulting agreement to cooperate occurred so late that any other conclusion would give rise to a very strong appearance that justice was not administered evenhandedly.

We anticipate that in the majority of cases a presumption of intrusion into the defense camp will not have to be made. For instance, many intrusions will likely occur where a government informant enters the defense camp in effort to secure his or her clandestine cover. Where there are such actual intrusions, a very real likelihood of prejudice must be presumed.

Problems arise where there is uncertainty as to whether an actual intrusion occurred, as in this case. In such a situation a court must examine the surrounding circumstances to determine whether an intrusion itself should be presumed. The court must look at the factors and give the benefit of the doubt to the defendants. This is precisely what we have done in this case. The intrusion is presumed due to the proximity of the change in plea to the commencement of the evidentiary portions of trial, the suggestion that plea negotiations had been on-going for approximately two weeks, and the fact that Eugene sat with and could participate with the defendants in jury voir dire prior to trial. Because of these facts our suspicions regarding an intrusion are raised to the point that to ensure fairness and due process, we must presume an intrusion.

Finally, we note that, even though we adopt the *Rispo* standard of a very real likelihood of prejudice, we also hold that this presumption, if applicable, is not irrebuttable. The Commonwealth may rebut the presumption where it can show by clear and convincing evidence that some method of providing a barrier between any information obtained regarding the defense posture of the case and the trial prepara-

[W]ithout detracting from the fundamental importance of the right to counsel in criminal cases, we have implicitly recognized the necessity for preserving society's interest in the administration of criminal justice. Cases involving Sixth Amendment deprivations are subject to the general rule that remedies should be tailored to the injury suffered from the constitutional violation and should not necessarily infringe on competing interests.

*Morrison*, 449 U.S. at 364, 101 S.Ct. at 667–68.

 Initially, it appears that a remand for an evidentiary hearing to identify whether there was any disclosure of defense strategies would be appropriate. However, after much consideration we conclude that such an endeavor would be an exercise in futility; one can never put the swarm of evils neatly back into Pandora's box. As the *Levy* court stated:

[I]t is highly unlikely that a court can, in such a hearing, arrive at a certain conclusion as to how the government's knowledge of any part of the defense strategy might benefit the government in its further investigation of the case, in the subtle process of pretrial discussions with potential witnesses, in the selection of jurors, or in the dynamics of trial itself.

*U.S. v. Levy*, 577 F.2d 200 at 208. The *Levy* court also noted that it may be too generous to assume that the government attorneys will act with the appropriate forthrightness in such encounters.[26] Finally, the federal court in *Levy* noted the difficulties of addressing the prejudice to the defendants post-trial:

At that point a trial court applying an actual prejudice test would face the virtually impossible task of reexamining the entire proceeding to determine whether the

tions for the prosecutor existed. Thus, no information obtained from the intrusion would pass to the prosecutors trying the case, and therefore no prejudice would arise. In this case the Commonwealth has not evinced such a barrier.

**26.** We do not necessarily seek to disparage the prosecutors. We do not decide that the prosecutors, under these circumstances, necessarily acted in derogation of the law.

> disclosed information influenced the government's investigation or presentation of its case or harmed the defense in any other way.

*Id.* We agree with the sound reasoning of the *Levy* court; however, unlike the *Levy* court we choose not to dismiss the charges.

■ Instead, we think the appropriate method to assuage the prejudice to the defendants in this case is to reverse the judgment of sentence and remand for a new trial. Any prejudice which may have been suffered by defendants will have likely dissipated since the assistant district attorneys, to a large extent, disclosed much of their evidence against the defendants at the first trial. Furthermore, a new trial would require an entirely new process of jury selection and presentation of evidence. While we are aware that not all of the prejudice which might have resulted from this situation may be removed from the case, we believe that the present disposition is much like any prosecution where an indicted co-defendant decides to cooperate with the Commonwealth. Such a circumstance does not ordinarily constitute legal prejudice to the defense.

A final note on due process as related by Judge James Rosen of the Third Circuit shall complete our analysis, as this passage eloquently reflects fundamental notions of due process and fairness which are at the core of the above analysis:

> The basic concept of due process is fair play. The test of our system of legal jurisprudence should be measured by the interest we take in safeguarding the fundamental rights of an accused. A defendant is entitled to a fair determination of his guilt. Fair trials insure our concern with due process and contribute to what we believe is the proper administration of criminal justice. It is only in this way that we prevent the undermining and mockery of justice. "The most fundamental of a reviewing court's duties is to see to it both that the end result in a case is just and correct and that the means utilized are fair and proper. Such is the essence of due process of law."

*Rispo,* 460 F.2d at 978 (quoting *Lowenstein v. Newark Board of Education,* 33 N.J. 277, 290, 163 A.2d 156, 162 (1960)).

We hold that under circumstances indicative of a very strong possibility of intrusion into the defense camp, a court may presume that a very real likelihood of prejudice inured to the defendants. This is the only way to ensure that the right to effective assistance of counsel is guaranteed. We, therefore, vacate the judgment of sentence on this ground and remand for a new trial.

## VI. ERRORS IN ADMISSION OF TESTIMONY AND EVIDENCE

 The defendants allege that several times during the trial, the trial court allowed testimony which was inadmissible or prejudicial. The defendants complain of the trial court's allowance of:

A. testimony concerning a prior beating of the victim and references to "made members" of the mafia;

B. the Commonwealth's impeachment of its own witness, Margaret Jackson;

C. the introduction of grand jury testimony of an unavailable witness;

D. a co-conspirator's statement admitted without prior evidence establishing a conspiracy;

E. admission of a newspaper article;

F. a state trooper's testimony as an expert interpreting conversations without being qualified as an expert; and

G. Thomas DelGiorno's testimony although he was convicted of a violation of the Election Code which involved an element of perjury.

A decision on the admission or exclusion of evidence is within the sound discretion of the trial court and will not be disturbed absent an abuse of that discretion. *Commonwealth v. Cohen,* 529 Pa. 552, 564, 605 A.2d 1212, 1218 (1992); *Commonwealth v. Ford,* 451 Pa. 81, 85, 301 A.2d 856, 858 (1973); *Commonwealth v. Franklin,* 397 Pa.Super. 265, 276, 580 A.2d 25, 31 (1990), *allocatur denied,* 527

Pa. 641, 593 A.2d 415 (1991); *Commonwealth v. Meadows,* 381 Pa.Super. 354, 366, 553 A.2d 1006, 1012 (1989), *allocatur denied,* 524 Pa. 618, 571 A.2d 381 (1989). "In clarifying the meaning of 'discretion of the trial court' in the context of determining whether to admit evidence, Judge Wieand explained that '[t]o receive evidence excluded by a rule of evidence is error; the trial court may not, in its discretion, ignore the rule.'" *Franklin,* 397 Pa.Super. at 276–77, 580 A.2d at 31 (quoting *Commonwealth v. Wagner,* 383 Pa.Super. 128, 134, 556 A.2d 462, 465 (1989) (Wieand, J., concurring)). Thus, in reviewing these claims of trial court error, we must limit ourselves to the above standard of review.

## A.

The defendants first allege trial court error for allowing testimony related to references of past criminal activity. Specifically, the trial court allowed testimony concerning a beating of Frank D'Alfonso four years prior to his death. The court also permitted references made by the prosecution to all of the defendants' status as "made" members of LCN when testimony revealed that a requirement to become a made member was participation in a homicide.

██ It has long been the law that evidence of prior criminal activity "is inadmissible against a defendant being tried for another crime because the fact of the commission of one offense is not proof of the commission of another." *Commonwealth v. Peterson,* 453 Pa. 187, 197, 307 A.2d 264, 269 (1973).

> [T]here sometimes exist special circumstances which operate as exceptions to the general rule and bring the case within the equally well established principle that evidence of other crimes is admissible when it tends to prove (1) motive; (2) intent; (3) absence of mistake or accident; (4) a common scheme, plan or design embracing commission of two or more crimes so related to each other that proof of one tends to prove the others; or (5) to establish the identity of the person charged with the commission of the crime on trial—in other words, where there is such a

logical connection between the crimes that proof of one will naturally tend to show that the accused is the person who committed the other. (citation omitted). When the evidence is relevant and important to one of these five issues, it is generally conceded that the prejudicial effect may be outweighed by the probative value. (footnote omitted).

*Id.*, 453 Pa. at 197–98, 307 A.2d at 269–70. By the time our supreme court decided *Commonwealth v. Billa,* 521 Pa. 168, 555 A.2d 835 (1989), three more exceptions to the general rule of exclusion of prior crimes testimony were added to the list. Evidence of prior crimes became admissible "to impeach the credibility of a defendant who testifies in his own trial; [in] situations where defendant's prior criminal history had been used by him to threaten or intimidate the victim; [and in] situations where the distinct crimes were part of a chain or sequence of events which formed the history of the case and were part of its natural development (sometimes called ["same transaction"] exception)." *Id.*, 521 Pa. at 177, 555 A.2d at 840 (citing *Commonwealth v. Lark,* 518 Pa. 290, 543 A.2d 491 (1988)).

This court has added a further gloss when an appellant challenges the admission of prior crime testimony. In *Commonwealth v. Hude,* 256 Pa.Super. 439, 390 A.2d 183 (1978), we suggested a balancing test which addressed four factors a court should consider before it rules on the admissibility of such evidence. The factors are:

■ the actual need for the other crimes evidence in the light of the issues and the other evidence available to the prosecution,

■ the convincingness of the evidence that other crimes were committed and that the accused was the actor, and

■ the strength or weakness of their other crimes evidence in supporting the issue, [weighed against]

■ the degree to which the jury will probably be roused by the evidence to over-mastering hostility.

*Hude,* 256 Pa.Super. at 445, 390 A.2d at 186. The *Hude* test is a "thumb-nail sketch," and offers guidance when

balancing the probative value of evidence against its preju-
dice. After considering all of these concerns and tests, we
find that the evidence was properly admitted to show the
motive of the parties.

### (i) Prior Beating of D'Alfonso

 We start with the testimonial evidence of the beat-
ing of D'Alfonso in 1981 where Gino Milano and Salvatore
Testa dealt several blows to the head and body of D'Alfonso
with a pipe and baseball bat, leaving him for dead. The
beating was introduced to show the history of the relation-
ship between Scarfo and Bruno. Testimony revealed that
former mob boss Angelo Bruno and D'Alfonso had been
involved in certain business ventures together prior to Bru-
no's slaying. When Scarfo became boss after Bruno's
death, he sent certain individuals to D'Alfonso to question
D'Alfonso about his present business dealings. D'Alfonso
refused to give Scarfo or any of his men the information
requested. Scarfo was also aware that a newspaper had
reported that D'Alfonso was the new LCN boss of the
Philadelphia family. Scarfo, thus, directed that D'Alfonso
be beaten. Thomas DelGiorno testified that Scarfo's dislike
for D'Alfonso commenced prior to the beating and contin-
ued after it.

 The evidence indicates a history of animosity
and resentment for Scarfo based on D'Alfonso's lack of
respect for Scarfo's position and failure to accord the mafia
the proper regard it deserved. Ill-will is relevant to show
motive in a homicide. *Commonwealth v. Chism*, 480 Pa.
233, 247, 389 A.2d 1041, 1048 (1978). The fact that the
beating of D'Alfonso was remote in time to his death is of
no consequence because remoteness in time affects the
weight of the evidence, not its admissibility. *Id.* Thus, the
evidence of the beating was certainly relevant to Scarfo's
motive.

 Moreover, it is the relationship of the other defen-
dants to Scarfo which makes this evidence relevant to them.
All other defendants, at the time of the killing, were either

members of the mafia or proposed members. The mafia operates because it demands respect and prestige from those within its membership, those associated with it, and those who are victimized by it. According to Thomas DelGiorno, where someone insolently attacks the power, prestige and reputation of the mob, as had D'Alfonso, all mafia members suffer. Therefore, because of their ties to the mafia and Scarfo, all of the defendants had a shared malice for the victim due to his brazen and cavalier attitude towards the Scarfo crime family.[27] Thus, admission of the evidence concerning the beating of D'Alfonso falls within the motive exception to the general rule prohibiting testimony of prior crimes and the trial judge did not abuse his discretion by admitting it. *Peterson, supra; Billa, supra; Ford, supra; Franklin, supra.*

Defendants argue that the evidence of the beating was more prejudicial than probative and that *Hude* requires prohibiting them from reaching the jury. *Hude* first requires an actual need for the evidence. *Hude, supra.* Here, there was actual need because this evidence was necessary to show that all of the defendants had a motive for the killing. The second prong of the *Hude* test requires that the evidence of the prior crime be convincing and that the accused was the actor. While Milano and DelGiorno were polluted sources, their testimony was deemed credible by the jury as they were the key prosecution identification witnesses and other evidence of the beating of the evidence helped to corroborate their stories. Third, the evidence of the beating was relatively strong to prove motive since Scarfo's disdain for D'Alfonso carried on after the beating according to DelGiorno. Finally we balance the above three

27. We also see the potential for an exception to the general rule against evidence of prior crimes in the same transaction exception. It seems that the killing could have been a natural step in the sequence. *See Billa, supra.* The beating was also relevant to show why D'Alfonso was a difficult target and took months to stalk. As a result of the beating, the victim became less mobile and tended to stay in the neighborhood close to his house. The original strategy for D'Alfonso's execution was to kill him while he was away from the neighborhood so that others would be less likely to be hurt.

considerations with the potential for the jury to be "roused to over-mastering hostility." *Hude, supra.* We find the balance tips in favor of admission of the evidence in that the beating evidence is a strong indication of motive which would not, under these instances, rouse the jury because they were told repeatedly that these defendants were not on trial for their association with any group but for the homicide of D'Alfonso. The jurors were also instructed in the final jury charge that the testimony concerned here was limited, for their use, to showing relationships of the parties and motive.

Ligambi also argues that the trial court erred by denying a defense motion requesting that all defendants' trials be severed from Scarfo's trial after Gino Milano testified about the 1981 beating of D'Alfonso. The decision whether to grant a motion for severance is within the sound discretion of the trial judge and will not be disturbed absent a manifest abuse of discretion. *Commonwealth v. Patterson*, 519 Pa. 190, 197, 546 A.2d 596, 599 (1988). "The defendant must show real potential for prejudice and not mere speculation." *Id.* Since the evidence of the beating is admissible against all defendants, as we have just found, and the law favors joining offenses when judicial economy can be achieved, we conclude that Ligambi's contention is devoid of merit. *Id.,* 519 Pa. at 197, 546 A.2d at 600.

*(ii) References to "Made" Membership in the Mafia*
(a) Nicodemo Scarfo, Salvatore Merlino, Lawrence Merlino, Francis Iannarella, and Frank Narducci

Defendants [28] argue that the court committed prejudicial error by allowing repeated comments referring to them as "made" members of the mafia. The Commonwealth counters that the testimony regarding made membership fell properly within the motive exception to the rule

**28.** For the purposes of the discussion in part VI(A)(ii)(a) of this opinion the term "defendants" shall refer to only Scarfo, the Merlino brothers, Francis Iannarella, and Frank Narducci.

against admission of prior crimes. When considered in light of the testimony that one had to participate in a killing in order to become a "made" member of the mafia, we are left with no doubt that the references to prior killings so tainted the jury's ability to objectively analyze the facts of the case that they were incapable of rendering a fair verdict. *See Commonwealth v. Roman*, 465 Pa. 515, 351 A.2d 214 (1976) (defendant is entitled to have jury determine his guilt or innocence in an objective manner). Since the prejudice to the defendants caused by these statements far exceeds their probative value, we must reverse the judgments of sentence of Scarfo, Lawrence and Salvatore Merlino, Francis Iannarella, and Frank Narducci on this issue.

■ The courts of this Commonwealth have long agreed that "evidence of prior criminal activity on the part of the accused is so highly prejudicial in its effect upon the jury as to be equalled only by an actual confession in its impact on the deliberative process." *Commonwealth v. Bryant*, 515 Pa. 473, 476, 530 A.2d 83, 85 (1987); *Commonwealth v. Spruill*, 480 Pa. 601, 606, 391 A.2d 1048, 1050 (1978); *Peterson, supra*. This court in *Commonwealth v. Frank*, 395 Pa.Super. 412, 577 A.2d 609 (1990), *allocatur denied*, 526 Pa. 629, 584 A.2d 312 (1990), stated:

> One of our most fundamental and prized principles in the administration of criminal law is that a distinct crime, except under special circumstances, cannot be given in evidence against a defendant who is being tried for another crime. This is because the fact that a person has committed one offense is not proof that he has committed another and because the effect of the testimony on the jury is nevertheless bound to create prejudice and an emotional reaction on their part against the defendant.

*Id.*, 395 Pa.Superior Ct. at 418, 577 A.2d at 612 (quoting *Commonwealth v. Burdell*, 380 Pa. 43, 47, 110 A.2d 193, 195 (1955)). In the context of the common plan exception to the rule against admission of prior crimes, the *Frank* court addressed that which a trial court must weigh when determining whether certain evidence is more prejudicial than

probative. "[T]he court must balance the potential prejudicial impact of the evidence with such factors as the degree of similarity established between the incidents of criminal conduct, the Commonwealth's need to present evidence under the common plan exception, and the ability of the trial court to caution the jury concerning the proper use of such evidence by them in their deliberations." *Id.*, 395 Pa.Superior Ct. at 422, 577 A.2d at 614. We believe that this test is also appropriate when considering the motive exception to the general rule of inadmissibility and find that the balance weighs heavily towards harmful prejudicial impact.

First, the testimony of Eugene Milano and Thomas DelGiorno reveals that in order to become a made member of the mafia a proposed member had to participate in a killing.[29] Upon a close examination of the record, it is clear that the jury heard repeated references to made membership and "making" ceremonies involving the defendants. The testimony establishes the similarity of the criminal conduct, homicide, and begins to establish the prejudice to the defendants. Where a defendant has been shown to have committed a prior act, it becomes easier for a juror to believe that the person committed a similar act.

Second, and most detrimental to the Commonwealth, is that the Commonwealth had no need to present the evidence of made membership. The five defendants were charged with murder and conspiracy to murder; they were not charged with violations of the Corrupt Organizations Act. Their prior crimes were simply not relevant. In essence, this case could, and perhaps should, have been tried as a conspiracy where Scarfo was the dominating "ring-leader" of the conspiracy whose underlings feared his wrath, thus causing them to buckle to Scarfo's commands. The Commonwealth's strategy could also have shown the incentive to follow Scarfo's commands would lead to greater rewards for the underlings. Such a strategy would have enabled the

**29.** The prosecution made an offer of proof that there were other ways in which a person could become a member of the mafia. A thorough review of the record indicates that no such other testimony ever was elicited.

Commonwealth to prove the same elements of the crime and elicit testimony of motive from the witnesses in a non-prejudicial manner. Instead, the Commonwealth chose to focus on the activities of the mafia and not the activities of the conspiracy.[30] The prosecution elected to employ a strategy whereby it could elicit defendants' prior criminal activities "through the backdoor." The Commonwealth's nomenclature, "made membership," totally circumvents the purpose of the rule against admission of evidence regarding prior crimes.

Had defendants been charged with violations of the Corrupt Organizations Act, then the evidence of the prior criminal activities may have been proper to establish predicate acts. Had defendants opened the door to impeachment of their credibility, then perhaps the evidence of prior criminal conduct may have been admissible. In this case none of the defendants testified; indeed, the defense presented no testimony at the close of the Commonwealth's case. There was, therefore, no reason to impeach the credibility of the non-testifying defendants.

Moreover, the testimony of made membership amounts to inadmissible hearsay. The Commonwealth offered the testimony of made membership for its truth—that to become "made," a proposed member had to participate in a murder—with no underlying support that convictions for any prerequisite crimes ever occurred. Without proof that the underlying homicides did, in fact, occur, the use of the term "made member" created nothing more than a trial within a trial. This we will not allow.

The prosecution has demonstrated no compelling need to refer to the defendants as made members of the mafia. Motive could have been established by other means. Even though there may be one method for presenting a relevant

---

30. We note that eliciting evidence of the mafia and its membership may not be prejudicial. However, the evidence of the mafia relationships in this case is so detailed as to provide that as a requirement to becoming an initiated member, one had to participate in a killing. This evidence, along with the testimony that defendants were made members causes the prejudice.

matter, where there are less prejudicial alternatives available to introduce the same evidence to the jury, a prosecutor should utilize the method which provides the least potential to disturb the objective decision-making of the jury. We find, therefore, that the Commonwealth's need to present this evidence was slight.

 Third, we fail to see how a cautionary instruction would have cured the prejudice. The trial court instructed in the main jury charge that the other crimes testimony was introduced for the limited purpose of establishing motive and relationship of the parties; the trial court also instructed the jury to consider only whether these defendants were guilty of the crime of killing and conspiring to kill D'Alfonso. Though this instruction is an accurate reflection of the law, its effect on the truth determining process must have been minimal. The instruction was given as one of many read to the jury in the final charge. The jury heard this instruction after numerous references to the defendants as made members of LCN during the course of the trial. Even if the trial court had cautioned the jury about the limited purpose of the evidence at the time of admission, such cautionary instructions still would not have cured the prejudice because the testimony was irrelevant and unnecessary, and the proof of motive could have been suggested in other ways.

After addressing the relevant factors, we conclude that when balancing the prejudicial impact against the probative value of the evidence indicating that defendants were made members, the prejudicial effect of these admissions of alleged prior murders, particularly without proof of conviction and sentence, far outweighs their probative value. There is no cure for this prejudice which so permeated the trial that the jury was incapable of rendering a fair and objective verdict. *Frank, supra.* Thus we must reverse the judgments of sentence of Scarfo, Salvatore Merlino, Lawrence Merlino, Francis Iannarella and Frank Narducci

and remand for a new trial.[31]

(b) Philip Narducci, Joseph Ligambi, and Nicholas Milano

[43] Philip Narducci, Ligambi and Nicholas Milano also claim that references to them as made members of the mafia constituted reversible error. We disagree. References to these three defendants as made members was directly relevant testimony to show their motive for the killing of Frank D'Alfonso. The testimony is not evidence of a past crime with respect to these three defendants. Instead, it is indicative of the reason why they performed the killing. The terminology "made member" indicates that the motive for the killing was to become "made"—a fully initiated member of LCN. Thus, we distinguish these three defendants from the rest on the following basis: these three defendants were "made" as a reward for the killing of D'Alfonso, whereas, evidence that the other five were made members is not probative of the killing of D'Alfonso and is tantamount to eliciting evidence of prior killings. We, therefore, find that the evidence of made membership with regard to Nicholas Milano, Joseph Ligambi and Philip Narducci was properly admissible as evidence of motive for the killing of Frank D'Alfonso. Thus the trial court did not abuse its discretion in admitting this evidence. *Ford, supra; Franklin, supra; Meadows, supra.*

We cannot agree with our colleague in dissent that all of the remaining members of the conspiracy somehow adopted the motive of Joseph Ligambi, Philip Narducci and Nicholas Milano. It strains credulity to argue that the other five defendants had some transferred motive to become members of the mafia as they already were members. Further, the argument that the participation in the crime by the other five defendants in some way constituted an adoption of these three defendants' motives to join the mafia is also similarly strained. Again, the five already initiated mem-

31. Because we resolve this issue in favor the defendants, we need not address their arguments that the trial court should have contemporaneously instructed the jury on the limited purpose of the made member testimony and that trial counsel was ineffective for not requesting such an instruction.

bers had no motive to join the organization. Even if motive could be adopted in this manner, the prejudice caused by alluding to the fact that the remaining five members had killed before would outweigh any probative value the evidence may have. *Hude, supra.*

### B.

Defendants next aver that the Commonwealth improperly impeached Commonwealth witness Margaret Jackson with her prior inconsistent statement regarding the evening D'Alfonso was shot. The prior inconsistent statement at issue was her grand jury testimony. At trial Miss Jackson stated, when asked whether she remembered testifying before a grand jury, that she "could have" but that she did not "remember back that far." When the prosecutor attempted to refresh her recollection of the grand jury hearing, he read her the questions and answers from the grand jury transcript which, if believed, impeached her in court testimony that she could not remember talking to police officers about the circumstances related to the fleeing suspects. There was no contemporaneous objection by defense counsel. The issue is, therefore, waived. *See* Pa.R.A.P. 302(a).

However, the Narducci brothers claim that their trial counselors were ineffective for failing to timely object to this questioning. In *Commonwealth v. Brown*, 302 Pa.Super. 391, 448 A.2d 1097 (1982), we stated that where a

> witness does not admit making the inconsistent statement, it may be proved by extrinsic evidence, such as the testimony of the person to whom the statement was made. It does not matter whether the witness denies making the inconsistent statement, or whether he says he does not recall it.

*Id.,* 302 Pa.Superior Ct. at 403, 448 A.2d at 1103–04. In this case the police officers to whom Miss Jackson spoke testified about the statements made by Jackson on the evening of the shooting. Since the Commonwealth had an indepen-

dent source for the evidence, the ineffective assistance of counsel claim lacks arguable merit. *Durst, supra.*

■■ Defendants also argue a basic and fundamental error occurred when the prosecutor improperly impeached Miss Jackson in his opening statement to the jury. The gist of the prosecutor's opening remarks was that some witnesses would be presented who would claim selective memory, that they had no recollection of the events or certain events, or that they saw and/or heard nothing. The prosecutor did not identify any of the people but he did say that some were children on the day of the shooting. Miss Jackson was seventeen years old on the day of the killing. Next, the prosecutor told the jury:

> to look at them closely, scrutinize them carefully and you will define the source of their forgetfulness which brings us to the people used by these defendants, the evidence will show, in their murder of Frank D'Alfonso.

We find no such error in the prosecutor's comments. A prosecutor's remarks in his " 'opening statement must be fair deductions from the evidence the Commonwealth in good faith expects to develop, not merely assertions intended to inflame the passions of the jury.' " *Commonwealth v. Stetler,* 494 Pa. 551, 562, 431 A.2d 992, 997 (1981) (quoting *Commonwealth v. Hughes,* 477 Pa. 180, 187, 383 A.2d 882, 886 (1978)). The record establishes that Miss Jackson was known to be a reluctant witness. It was not improper for the Commonwealth to direct the attention of the members of the jury to bear in mind their perceptions of reluctant witnesses.[32] *See Commonwealth v. Brady,* 510 Pa. 123, 129, 507 A.2d 66, 69 (1986) (juror may use sensory observations, experience, common sense and logic to assess credibility of witnesses and determine the truth); *see also Commonwealth v. Graham,* 522 Pa. 115, 560 A.2d 129 (1989); *Commonwealth v. Blount,* 387 Pa.Super. 603, 564 A.2d 952 (1989).

**32.** Since the underlying claim lacks merit, defendants' claim for ineffective assistance also lacks merit. *Durst, supra.*

## C.

At trial the grand jury testimony of Sam (a/k/a Sam the Barber) LaRussa was read to the jury. LaRussa was an unavailable witness due to health concerns. The defense and Commonwealth attorneys agreed to read a version of the grand jury transcript which the trial court allowed. The testimony in large part concerned a gathering of twenty to thirty Italian males at LaRussa's home. Scarfo, who was among the men at the house, arranged for a meeting there and asked if he could bring along some friends. After the men arrived at the house, LaRussa left and did not return until after Scarfo had left. What transpired in the interim, the Commonwealth argued, was a "making" ceremony.

Ligambi now raises the issue that the testimony relating to Italian males was an impermissible attempt by the prosecution to prove guilt by association. The testimony of LaRussa was incorrectly admitted by the trial judge because it was irrelevant. The Honorable Eugene Clarke stated in his opinion:

> This testimony corroborated the testimony of Thomas DelGiorno and Eugene Milano concerning a mafia-making ceremony held at LaRussa's home.... [T]he probative value outweighed any perceived prejudice to the defendants.

As we determined in section VI(A)(ii)(a) of this opinion, evidence of made membership and, consequently, "making ceremonies" was highly prejudicial and lacked probative value. *Frank, supra.* We, therefore, decide that the testimony of the making ceremony at the home of LaRussa was impermissible evidence for which reversal is required.

## D.

Ligambi and Lawrence Merlino allege error in allowing testimony of extra-judicial statements of a co-conspirator when there was no independent evidence of a conspiracy. The trial court correctly decided that this issue was waived since defense counsel failed to object to the admission of the

evidence at trial. *Commonwealth v. Berrios*, 495 Pa. 444, 453–54, 434 A.2d 1173, 1178 (1981). Defendants raise this issue in the alternative as ineffective assistance of counsel for failure to object. We shall, therefore, address whether there is arguable merit to this claim.

In Pennsylvania, co-conspirators statements are admissible "against an accused if the statements are made during the conspiracy, in furtherance thereof, and where there is other evidence of the existence of a conspiracy." *Commonwealth v. Dreibelbis*, 493 Pa. 466, 475, 426 A.2d 1111, 1115 (1981) (citing *Commonwealth v. Garcia*, 478 Pa. 406, 387 A.2d 46 (1978)). The *Dreibelbis* court also stated that for purposes of the co-conspirators exception to the hearsay rule, a conspiracy may be established inferentially through the "relation, conduct or circumstances of the parties." *Id.* (citing *Commonwealth v. Roux*, 465 Pa. 482, 350 A.2d 867 (1976)). The order of proof in these matters is within the discretion of the trial court which may admit such statements upon only slight proof of conspiracy, subject to later proof of the conspiracy. *Commonwealth v. Kersten*, 333 Pa.Super. 343, 350, 482 A.2d 600, 603 (1984); *Commonwealth v. Plusquellic*, 303 Pa.Super. 1, 8, 449 A.2d 47, 51 (1982).

First, Ligambi and Lawrence Merlino argue that the statement Merlino made at the meeting at the Wok Restaurant suggesting to Scarfo that Ligambi be used in the killing was made before the conspiracy commenced and that it should have been excluded. DelGiorno's testimony, regarding the statements by Merlino, was sufficient to create slight proof of the conspiracy. That testimony indicated that Merlino was present at the meeting and that he was a subordinate of Scarfo's. Scarfo announced the plan to kill D'Alfonso, and that the Milanos and the Narduccis would do the killing with DelGiorno and Iannarella supervising the execution. Lawrence Merlino then suggested that Ligambi also help. This testimony indicates that the statement was made after the conspiracy commenced.

 Ligambi also argues that the testimony of Eugene Milano, which indicated that DelGiorno told Milano that Ligambi was part of the assassination group and that Ligambi was to obtain a car, was also inadmissible. This claim, too, is meritless. DelGiorno had already testified that he had discussed the killing with Ligambi, given money to him to procure an untraceable car for use in the stalking and killing, and discussed a potential escape route if an earlier attempt on D'Alfonso was successful. Thus, Ligambi and Lawrence Merlino's claims have no merit as there was at least slight evidence of a conspiracy prior to the testimony of the co-conspirator statements. *Dreibelbis, supra; Kersten, supra.* Since the underlying claim lacks merit, so too does the ineffective assistance of counsel claim. *Durst, supra.*

Ligambi also asserts, in an ineffectiveness claim for failure to object, that Lawrence Merlino's statement at the Wok Restaurant was inadmissible because under the Pennsylvania Constitution the prosecution failed to establish the unavailability of the declarant. Ligambi recognizes that the issue he raises was resolved adversely to him by the United States Supreme Court in *United States v. Inadi,* 475 U.S. 387, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986). He argues, however, that our supreme court, in a case decided applying the United States Constitution, left open the question of whether the unavailability has to be established under the Pennsylvania Constitution. *Commonwealth v. Pinkins,* 514 Pa. 418, 525 A.2d 1189 (1987), *cert. denied,* 484 U.S. 867, 108 S.Ct. 192, 98 L.Ed.2d 144 (1987). Ligambi relies upon Justice Flaherty's concurring statement, joined by two other justices, indicating that the question was yet to be resolved under our Constitution.

 Ligambi's trial counsel did not render ineffective assistance. Trial counsel is not ineffective for failing to predict or anticipate a change in law. *Commonwealth v. Davis,* 518 Pa. 77, 541 A.2d 315 (1988); *Commonwealth v. White,* 515 Pa. 348, 528 A.2d 596 (1987). This is particularly so where the argument stems from a minority of justices

stating a common legal maxim. Ligambi also speciously argues that the Commonwealth failed to prove Lawrence Merlino's unavailability because Merlino could have testified if his motion for severance was granted and the prosecution gave Merlino use immunity for his testimony. This argument presumes the Commonwealth would have consented to use immunity. *See Commonwealth v. Watson*, 355 Pa.Super. 160, 512 A.2d 1261 (1986), *allocatur denied*, 515 Pa. 579, 527 A.2d 540 (1987). Finding no merit to Ligambi's argument, his claim for ineffectiveness lacks muster. *Durst, supra.*

### E.

■ Defendants next argue that the trial court erred in allowing a newspaper article to be read to the jury. This issue is raised in the briefs of Ligambi and Lawrence Merlino and concerns a Philadelphia Daily News article which stated that D'Alfonso had became the new mob boss. The following discussion occurred when Commonwealth attorney Grant introduced the newspaper article to the court:

MR. GRANT: At this point there has been another stipulation entered into between Counsel with respect to a photocopy enlargement of a newspaper article printed in the May 27th, 1984 issue of the Daily News. I would like to have Detective Manford Ridgeway read that into the record, Your Honor.

THE COURT: May 27th, 1984?

MR. GRANT: Yes; for the benefit of the jury.

Detective Ridgeway was sworn and the following ensued:

Q. Detective Ridgeway, would you proceed to read those portions of the article, sir, beginning with the titled caption?

A. Yes. "A New Don takes over Philly mob." Dated May 27th, 1981. Philadelphia Daily News.

MR. SIMONE: Excuse me. Judge, I think—since it is a newspaper article, it should be—the jury should be told the purpose of this evidence and the use of this evidence

rather than just accepting a newspaper article as evidence.

THE COURT: I will—

MR. SIMONE: —explain that to them?

THE COURT: Yes.

MR. SIMONE: Thank you.

Detective Ridgeway then read the article to the jury after which the trial court called the attorneys to sidebar to reach an acceptable limiting instruction. Judge Clarke ended the sidebar and gave the following agreed upon instruction:

THE COURT: Ladies and Gentlemen, Counsel have agreed that the purpose of having that article read to you was to establish the fact that there was publicity concerning Mr. D'Alfonso being made the boss, however, it was not offered to show the truth of the fact that he was or was not made the boss, just that the article read as it was supposed to read.

First Ligambi argues that confusion about the date of the article served to muddle the issues of the beating of D'Alfonso with his murder. Ligambi and Lawrence Merlino in their briefs state that the date of the article was May 27, 1984. However, it is the testimony of the officer which is the evidence and not the statements of the attorneys and the trial court. The jury heard this instruction numerous times throughout the trial as well as in the opening charge to the jury. Thus, the confusion must be resolved in accordance with the evidence of record—May 27, *1981*. The evidence was, therefore, relevant to corroborate DelGiorno's and Eugene Milano's, statements that Scarfo knew there was publicity related to D'Alfonso and his reputation as a mob leader. This evidence was offered to show the state of mind of Scarfo. *Commonwealth v. Wright*, 455 Pa. 480, 486, 317 A.2d 271, 274 (1974) (out-of-court statements are admissible to show state of mind); *Commonwealth v. Blough*, 369 Pa.Super. 230, 237 n. 11, 535 A.2d 134, 138 n. 11 (1987) ("statement may be offered to show the effect on the listener and the state of mind produced, including motive").

 Secondly, the defendants argue that the limiting instruction was inadequate. They suggest that the instruction should have contained information related to motive. Defendants correctly assert that they were entitled to a limiting instruction. *See Commonwealth v. Covil*, 474 Pa. 375, 378 A.2d 841 (1977). The instruction given by the trial judge, however, was *agreed upon by defense counsel* and clearly stated that the article was offered to show that there was publicity and not that what the article stated was the truth. A trial judge may word a limiting instruction in any manner he or she chooses so long as the expression clearly indicates the limited use of the evidence. We conclude that the trial judge clearly, fully and adequately instructed the jury on the limited use of the newspaper article.[33]

## F.

Lawrence Merlino claims that his trial counsel was ineffective for failing to object to the trial court's decision to allow State Trooper Edward Johnson to testify as an expert interpreting conversations without first having been qualified as an expert. Even assuming a claim of arguable merit in this ineffectiveness charge, Lawrence Merlino has not demonstrated how trial counsel's failure to object prejudiced him. *Commonwealth v. Pierce*, 515 Pa. 153, 527 A.2d 973 (1987). Lawrence Merlino's claim of ineffective assistance of counsel, therefore, must fail. *Id.*

## G.

 Next, Lawrence Merlino claims ineffective assistance of counsel for failure to object to the competency of Thomas DelGiorno as a witness under the Disqualification Act, 42 Pa.C.S. § 5912. Merlino alleges DelGiorno's incompetence due to DelGiorno's previous conviction under the

---

**33.** Lawrence Merlino also argues that counsel's failure to object to the admission of the article. We note that the record indicates that the reading of the article was stipulated to by the defense. As decided above the article was admissible and Merlino's claim, therefore, lacks arguable merit. *Durst, supra.*

Election Code in which he lied about his age, and admitted to having lied to the Pennsylvania Liquor Control Board. This claim also fails because it lacks arguable merit.

The Disqualification Act ("Act") provides "[i]n a criminal proceeding, a person who has been convicted in a court of this Commonwealth of perjury ... shall not be competent as a witness for any purpose...." 42 Pa.C.S. § 5912. In order to be an incompetent witness under the Act, one must have been convicted of perjury. In *Commonwealth v. Trudell*, 371 Pa.Super. 353, 538 A.2d 53 (1988), *allocatur denied*, 519 Pa. 665, 548 A.2d 255 (1988), we stated that "only an actual conviction of perjury provides" a ground for incompetence. *Id.*, 371 Pa.Superior Ct. at 362, 538 A.2d at 57. We also held in *Trudell* that even an admission of past lying will not require disqualification from testifying. *Id.* Thomas DelGiorno has never been convicted of perjury and his admissions to lying and his conviction for violating the Election Code did not impair his qualification as a witness. Merlino's complaint of ineffectiveness, therefore, lacks arguable merit. *Durst, supra.*

## VII. ERRORS IN THE JURY CHARGE

Defendants raise four arguments related to the trial court's charge to the jury. They argue that the trial court erred in failing to explain in the charge that circumstantial evidence could be used to acquit as well as to convict, that there was error in the charge related to conspiracy and accomplice testimony, and that the judge failed to instruct the jury that Eugene Milano's guilty plea could not be used against the other defendants with whom he sat at the commencement of trial. "The guiding principle in reviewing an allegedly erroneous jury instruction is that the charge is to be read in its entirety." *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 46, 454 A.2d 937, 953 (1982) *cert. denied* 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983) (citing *Commonwealth v. Woodward*, 483 Pa. 1, 394 A.2d 508 (1978)); *Commonwealth v. Edwards*, 521 Pa. 134, 161, 555 A.2d 818 (1989). "A court's charge to the jury will be

upheld if it adequately and accurately reflects the law and was sufficient to guide the jury properly in its deliberations." *Commonwealth v. Dykes,* 373 Pa.Super. 258, 263, 541 A.2d 1, 3 (1988), *allocatur denied,* 520 Pa. 602, 553 A.2d 965 (1988) (quoting *Commonwealth v. Person,* 345 Pa.Super. 341, 345, 498 A.2d 432, 434 (1985)). Additionally, the trial court has broad discretion in phrasing its points for charge. *Commonwealth v. Magwood,* 371 Pa.Super. 620, 538 A.2d 908 (1988), *allocatur denied,* 519 Pa. 653, 546 A.2d 57 (1988).

Ligambi argues that no instruction was ever given regarding Eugene Milano's change in plea. A discussion and agreement as to the content of such a charge was, in fact, discussed at a pre-charge conference. Defense counsel, the prosecutors and Judge Clarke attended that conference. Ligambi also argues that his counsel's failure to object when the charge was not given constituted ineffective assistance of counsel. The trial court's instruction on Eugene Milano's change in plea was as follows:

You heard testimony from two Commonwealth witnesses, Thomas DelGiorno and Eugene Milano, who pled guilty to charges arising out of the same facts as this case. You are instructed that you are to draw no conclusions or inferences about the guilt of these defendants on trial from the mere fact that those prosecution witnesses pled guilty on similar charges. Those witnesses' decisions to plead guilty were a personal decision made about their own guilt. The mere plea of guilty by those two witnesses may not be used as evidence of the guilt of the defendants on trial. You may not conclude that merely because two persons pled guilty that the defendants or any of them are guilty in this case.

This charge adequately and accurately reflects the law related to co-defendants who plead guilty. It reflects as well the compromise reached at the discussion on the points for charge. *Dykes, supra; Magwood, supra.* Since the charge Ligambi complains was not given indeed was given, his argument lacks merit. It is also worthless to argue that

trial counsel can be ineffective for failing to object to a charge when trial counsel agreed to the charge that the court gave. *See Durst, supra.*

 Scarfo argues that the trial judge's charge to the jury insufficiently characterized the use of circumstantial evidence by framing the instruction in terms of its use to convict. He contends that circumstantial evidence may also be used to acquit. The judge's charge on circumstantial evidence was as follows:

In this case as in most cases the evidence was of two different types. On the one hand there is direct evidence which is testimony by a witness from his or her own personal knowledge such as something he or she saw or heard. The other type is circumstantial evidence which is testimony about facts which point to the existence of other facts which are in question.

A classic example of this kind of evidence, circumstantial evidence, is suppose you retired on a winter night and the streets were clear. When you awakened snow was on the street and sidewalk and you saw footsteps in the snow. You would properly conclude that snow had fallen during the night, although you didn't see it snow, and that somebody had walked in the snow, although you didn't see anybody ... Whether or not circumstantial evidence is proof of the other facts in question depends in part on the application of common sense and human experience. If you go into the movies and and the streets are dry and when you come out there is rain and the streets are wet then you know it rained while you were in the movies. That is common sense and human experience. You should recognize that it is sometimes necessary to rely on circumstantial evidence in criminal cases, particularly where the crime was committed in secret. In deciding whether or not to accept circumstantial evidence as proof of the facts in question, you must be satisfied first that the testimony of the witness is truthful and accurate and second, that the existence of the facts the

witness testifies to lead to the conclusion that the facts in question also happened.

Circumstantial evidence alone may be sufficient to prove a defendant's guilt. If there are several separate pieces of circumstantial evidence it is not necessary that each piece standing alone convinces you of a defendant's guilt beyond a reasonable doubt. Instead, before you may find any of the defendants guilty, all of the pieces of circumstantial evidence, when considered together, must reasonably and naturally lead to the conclusion that a defendant is guilty and must convince you of that defendant's guilt beyond a reasonable doubt. In other words, you may find any of the defendants guilty based on circumstantial evidence alone, but only if the total amount and quality of that evidence convinces you of the defendant's guilt beyond a reasonable doubt.

This instruction is almost identical to Pennsylvania Suggested Standard Jury Instruction 7.02A (Crim.).

We think that Scarfo's suggestion to apprise the jury that circumstantial evidence may be used to acquit would only serve to confuse rather than aid the jury in their deliberation of the truth. The danger of informing the jury that such evidence may be proof of acquittal as well as guilt could potentially serve to confuse the jury on the appropriate standard of proof of guilt. In a case such as this, where the defense presented no witnesses, Scarfo's instruction may have prejudiced defendants by suggesting that defendants had some burden to show evidence, perhaps circumstantial evidence, of acquittal. This is clearly not the law. Indeed, the instruction given was intended to aid the jury and reflect the clearest instruction on the law of circumstantial evidence. *Dykes, supra.* It is clear that the court informed the jury repeatedly that guilt must be found beyond a reasonable doubt. The jury could thus use circumstantial evidence as evidence for acquittal in its search for reasonable doubt; the court instructed the jury to consider the totality of the circumstantial evidence. We conclude, therefore, that the charge on circumstantial evi-

dence comports with the law and was sufficient to aid the jury in resolving their fact-finding mission. *Dykes, supra; Zettlemoyer, supra.*

■■■ The final charge defendants challenge pertains to the instruction that conspiracy can be inferred from "the evidence, surrounding circumstances, conduct and relations of the parties." Ligambi and Lawrence Merlino argue that the case of *Francis v. Franklin,* 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985), requires that a jury be charged that before any inference may be drawn, the inferred fact must more likely than not flow from the proven fact. The *Francis* charge did not relate to conspiracy. The jury charge in *Francis* concerned a presumption that a person of sound mind and discretion intends the natural and probable consequences of his acts. *Id.* at 311, 105 S.Ct. at 1969. The jury instruction in this case is quite different.

> In this case the judge charged the jury as follows:
> By it's [sic] very nature the crime of conspiracy is frequently not susceptible to proof except by circumstantial evidence and although a conspiracy cannot be based upon mere suspicion or conjecture, a conspiracy may be inferentially established by showing the relationship, conduct of circumstances of the parties, conduct or circumstances of the parties and the overt action of the alleged co-conspirators.
>
> \* \* \* \* \* \*
>
> Now, in order to find the defendants guilty of conspiracy to commit murder you must be satisfied initially that the following two elements of conspiracy have been proven beyond a reasonable doubt.

The trial court then charged the jury on the elements of conspiracy.

This charge on conspiracy is consistent with the case law of our Commonwealth. "A conspiracy may be proven inferentially by showing the relation, conduct, or circumstances of the parties, and the overt acts of alleged co-conspirators are competent as proof that a criminal confederation has in

fact been formed." *Commonwealth v. Kennedy,* 499 Pa. 389, 395, 453 A.2d 927, 930 (1982) (citing *Commonwealth v. Eiland,* 450 Pa. 566, 570, 301 A.2d 651, 652 (1973)); *Commonwealth v. Carter,* 329 Pa.Super. 490, 499, 478 A.2d 1286, 1290 (1984). Judge Clarke adequately and accurately charged the jury on the crime of conspiracy. *Dykes, supra.*

## VIII. ALLEGATIONS OF PROSECUTORIAL MISCONDUCT

 Defendants raise several allegations of prosecutorial misconduct related to statements made during the course of closing arguments. The allegations of misconduct are as follows:

A. referring to defendants as a group of criminals;

B. referring to defendants as wolves, a wolf pack, and the pack;

C. improper bolstering of and vouching for Commonwealth witnesses; [34]

D. arguing facts outside of the record; and

E. creating negative inferences prejudicial against defendants by calling attention to the fact that no defense attorney ever called Gino Milano a liar on cross-examination.

Our supreme court court has recently capsulated our standard of review as follows:

"Every unwise or irrelevant remark made in the course of a trial by a judge, a witness, or counsel does not compel the granting of a new trial." *Commonwealth v. Goosby,* 450 Pa. 609, 611, 301 A.2d 673, 674 (1973). Rather, the focus is on what, if any, effects the comments had on the jury. A new trial is required when the effect of the District Attorney's comments "would be to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant so that they could not weigh the evidence objectively and render a true verdict." *Commonwealth v. Van Cliff,* 483 Pa. 576, 582, 397 A.2d 1173,

---

**34.** This allegation also concerns prosecutorial conduct during the taking of testimony.

1776 (1979), *cert. denied,* 441 U.S. 964, 99 S.Ct. 2412, 60 L.Ed.2d 1070 (1979), quoting *Commonwealth v. McNeal,* 456 Pa. 394, 400, 319 A.2d 669, 673 (1974). Further, this decision is for the trial court to make. Our role is to determine solely whether the trial court abused its discretion. *Van Cliff,* 483 Pa. at 582, 397 A.2d at 1176.

*Commonwealth v. Faulkner,* 528 Pa. 57, 79, 595 A.2d 28, 39 (1991). Some errors of prosecutorial misconduct may be harmless; however, before we can affirm a conviction the burden is on the prosecution to demonstrate that the error was harmless beyond a reasonable doubt. *Commonwealth v. Collins,* 462 Pa. 495, 502–03, 341 A.2d 492, 495 (1975).

> "[A]n error may be harmless where the properly admitted evidence of guilt is so overwhelming and the prejudicial effect of the error is so insignificant by comparison that it is clear beyond a reasonable doubt that the error could not have contributed to the verdict." [*Commonwealth v. Story,* 476 Pa. 391, 412, 383 A.2d 155, 166 (1978)] (citing *Commonwealth v. Davis,* 452 Pa. 171, 178–79, 305 A.2d 715, 719 (1973)). The untainted evidence relied upon to determine whether there is overwhelming evidence of guilt must be contradicted. *Id.,* 476 Pa. at 413, 383 A.2d at 166.

*Commonwealth v. Brooks,* 362 Pa.Super. 236, 242, 523 A.2d 1169, 1172 (1987). Bearing in mind this standard, we now address the allegations of prosecutorial misconduct levied against Charles Grant and Brian McMonigle, the assistant district attorneys who prosecuted this case.

### A.

The first allegation is that the defendants were stigmatized in the minds of the jury when they were called a "group of criminals" during the Commonwealth's summation. When Robert Simone closed to the jury, he addressed certain historical events which he argues were familiar to the jury to illustrate that sometimes legal decisions are made due to public outcry and not in the name of justice. Simone argues that he raised the specter of union-busting,

Japanese–American interment in concentration camps during World War II, the McCarthy era, the Civil Rights movements and the Vietnam War to impress upon the jurors their responsibility to follow the rules of law, and not simply bow to public pressure.

In closing arguments, the prosecution followed by stating:

I would like to say at the outset that it's true you don't have to be Italian to be persecuted in South Philadelphia.

In the 1930's unionists were trying to gain a better life for a decent wage and working hours for their own and that is a laudable and meritorious attempt.

In the 1940's Oriental–Americans were trying to be good American citizens, till the soil, work in factories just like everybody else, and because their former country engaged in aggressive action they were put in concentration camps.

In the 1950's if you had a thought of mind, a frame of mind, if you thought that people had certain civil dignities that were to be protected, if you thought that you don't have to think a certain way people were hounded, put in prison, blackballed and so forth.

And in the 1960's during the striving of the civil rights era when those laudable goals of human justice were being challenged at every front, there were people who were willing to die for that.

In the 1970's because people were being killed in a foreign country and there was a disagreement here and at home it was no better than the civil war in the 1860's. Families were divided, brothers were fighting brothers. And for Mr. Simone, to stand here in all his pomp and arrogance and to liken what the evidence shows these group of criminals are and equate that—

MR. SIMONE: Excuse me, Your Honor. I have to reluctantly move for a mistrial, calling the defendants criminals.

A sidebar discussion was then held. After the sidebar the judge cautioned the jury:

Ladies and Gentlemen of the Jury, as you have been told from the beginning, the issue in this case is whether or not these defendants conspired to kill and did kill Mr. D'Alfonso. It is for you to determine from the evidence whether or not these defendants committed those crimes. Their past histories, whatever they may be, are not at issue in determining whatever their guilt or non-guilt may be as far as these crimes that they are charged with today is.

Mr. Simone?

MR. SIMONE: Thank you, your honor.

The Commonwealth argues that its closing argument was a fair rebuttal to Simone's closing address. Regardless of this, the Commonwealth contends that the cautionary instruction cured any prejudice which may have resulted from the remark.

"The prosecutor may always argue to the jury that the evidence establishes the defendant's guilt, [citation omitted] although a prosecutor may not offer his personal opinion as to the guilt of the accused either in argument or in testimony from the witness stand. [citations omitted]" *Commonwealth v. D'Amato*, 514 Pa. 471, 489, 526 A.2d 300, 309 (1987). Calling defendants "criminals" in a closing argument is a serious and prejudicial statement of opinion by the prosecution. It is not simply the facts of a particular case which support calling a defendant a criminal. The key is that before a person may be stigmatized by the label "criminal," there must be a guilty verdict or a plea of guilt. Indeed, this is the most basic concept in our system of criminal law; one is innocent until proven otherwise. In this case there was no evidence of any prior criminal adjudications, nor does the context in which the statement was made support the prosecution's label that the defendants were criminals. We are thus constrained to find that the comment was inappropriate.

However, the polestar of this matter is whether the jury was prejudiced to the point where the prosecution's comments instilled a fixed bias and hostility toward the defen-

dants. *Faulkner, supra.* In our estimation the trial court's cautionary instruction relieved, in the jury's minds, any fixed bias or hostility. We note, too, that the defendants agreed with the cautionary instruction, and that "juries can be trusted to follow the trial court's instructions." *Parker v. Randolph,* 442 U.S. 62, 75 n. 7, 99 S.Ct. 2132, 2140 n. 7, 60 L.Ed.2d 713 (1979). Having given an adequate cautionary instruction, we conclude the trial court did not abuse its discretion in denying the motion for mistrial. *Faulkner, supra.*

### B.

 Defendants next contend that the trial court committed reversible error by allowing the prosecution to refer to the defendants as "wolves," "a wolf pack," and "the pack." The Commonwealth argues that Donald Marino, defense attorney for Philip Narducci, opened the door to the animal imagery by calling prosecution witnesses "vicious vermin" and "ravenging wolves" in his closing argument. In response, the assistant district attorney paraphrased the defense attorney's comments:

... Well, you lied to us Thomas DelGiorno. You are a raven[ ]ing wolf.

The prosecutor then continued:

I couldn't help it, but that word strikes me "raven," I think it is a French or German word. It really means to rush, like they say "to bum rush somebody," to rush, to devour greedily. And these witnesses were called ravening wolves. It's a Biblical reference Mr. Marino likes to make.

That story is very much like the animal kingdom because wolves run in packs, you see. And this case is a story of an animal of prey, predators who are attacking an animal who was a little bit too old, a little bit too weary, a little bit too beaten to defend himself and his younger more vicious predator, knowing all these affirmities, [sic] hunted him down like wolves in a pack. Wolves are by their very nature very cowardly. That is why they

seek the security of numbers and they attack you from the back and the side and wherever you turn they are going to try to get you, you see. You very seldom find that exception in nature called the lone wolf who would break away from the pack, who are willing to fend for themselves and don't use the bonds of others to do what they have to do in life. Well you had two lone wolves in this case. One of them was sitting over there with the pack and he booked, he bolted and he got over there (indicating). So he's now ravenous, he's a vicious vermin, that guy, Gino.

**But now we have all the wolves and the leader of the pack in this room here on trial for the cowardly killing of the old, beaten, infirmed prey of Frank D'Alfonso.** And while you're analyzing the principles of human or animal law or the law of conspiracy, one principle is always going to hold true. **When you hunt with the pack you share in the kill.** And if you share in the kill, you share in the liability. **Wolf pack.** Conspiracy. It's the basic law. Basic.

These comments "exceeded the bounds of propriety and constituted an appeal to the passions and prejudices of the jury." *Commonwealth v. Lipscombe*, 455 Pa. 525, 528, 317 A.2d 205, 205 (1974). In *Lipscombe*, our supreme court reversed a judgment of sentence and ordered a new trial where in summation the prosecutor called defendants "hoodlums" and "animals." The court stated:

In referring to Lipscombe and his associates by the epithets of "hoodlums" and "animals", the assistant district attorney interjected his personal belief in the guilt of the accused. Such expressions of personal belief ... have no legitimate place in a district attorney's argument.

*Id.* (quoting *Commonwealth v. Capalla*, 322 Pa. 200, 206, 185 A. 203, 206 (1936)).

Later, in *Commonwealth v. Brown*, 274 Pa.Super. 609, 418 A.2d 573 (1980), this court addressed a case in which the prosecutor referred to defendant as part of "a pack of wolves." *Id.*, 274 Pa.Superior Ct. at 612, 418 A.2d at 575. *Brown* arose in the context of a claim of ineffective assis-

tance of counsel. The court found that Brown's counsel was not ineffective for failing to object to the epithet because he had already lodged several objections and did not want to offend the jury with more. *Id.* However, the court also remarked that "[s]urely, it was improper for the prosecutor to label the assailants a 'pack of wolves.'" *Id.* Indeed, we too find that it was improper for the assistant district attorney to resort to such animal imagery to curry favor with the jury.

There is no reason for such base assertions by a prosecutor when he can rely on a case as strong as this one. The Commonwealth's argument that a defense attorney first raised the issue of animal imagery is of no merit. It is one thing for a defense attorney to attack a witness with certain debasing claims, but it is error for the prosecutor with authority of the Commonwealth to attack a person standing accused. A jury can sort out the truth when witnesses are assailed by such remarks. Where debasing epithets are hurled at the accused, however, the jury becomes indelibly marked or prejudiced to the point where its objective search for the truth becomes difficult, if not impossible.

Justice forbids us from treating these defendants differently from any other person who stands accused of a crime. Indeed, if any citizen stood accused of a clear-cut violation of retail theft and were degraded and dehumanized as these defendants were, no judge would feel a pang of regret in reversing such a conviction. Where the defendants are as notorious as these, however, we become troubled by such a decision. Nonetheless, this sense of concern does not warrant shirking our duty to do justice. These ideals, the foundation of our criminal justice system, are meaningless if not applied evenhandedly.

It is the onus of every court in this Commonwealth to do justice—what is legally correct—no matter how painful that may be. That, in essence, is the nature of what a court does. Justice in this case requires reversal for a new trial because the defendants were not properly treated with

fundamental fairness. This fundamental fairness as stated in *Rispo,* infra, *is the heart of the notion of due process.*

Moreover, we are compelled to note that it is the prosecutor who is the servant of the court, the public, and indeed justice itself. It is axiomatic to say that a prosecutor's job is not merely to gain convictions. Most importantly, the prosecutor must serve justice. He or she wields the power of the state in order to do for the public and those victimized by evil that which is fair and right. At the same time, a prosecutor must weigh what is fair and right for the person who stands accused. We understand that a Commonwealth attorney, embroiled in the heat of a trial of notorious defendants feels especially compelled to attain a conviction. Still a prosecutor may not, at the same time he or she so dutifully represents the public's interest, fracture the right to a fair trial for the accused. Such infractions, unintentional though they may be and prompted by the stress of a high-profile case, are prejudicial nonetheless.

We are especially concerned that prosecutorial misconduct seems to arise in Philadelphia County more so than in any other county in this Commonwealth. We merely state this in order to alert the District Attorney that a more thoughtful approach to the prosecutor's role in our society may be in order. That is not to say that the public's legal counsel should not be determined in its fight against crime, but we emphasize that a prosecutor must always be aware of the unique and perhaps conflicting role he or she plays in in our society. Trial judges should also be aware that it is their responsibility to control the heat and battle of trial. Where the trial court senses that a summation may have strayed off course, it behooves the court to set counsel back on the path of argument. Thus, justice may be served.

We hold, therefore, that the trial court abused its discretion in refusing defense counsels' request for a mistrial.[35] *Faulkner, supra; Van Cliff, supra.*

---

**35.** The Commonwealth urges that no timely objection was filed regarding the labels of "wolves" and "wolf pack." This is inaccurate. Defense Attorney Pinsky lodged an objection just after the Common-

## C.

There is no reason for us to address the remaining allegations of prosecutorial misconduct due to our disposition of the previous claim. However, we do note that given the fervid atmosphere of the trial and the fact that there was arguable merit to defendants' other contentions of prosecutorial misconduct, we believe that the jury was unable to render an objective verdict. The defendants also argued that the prosecutor misconducted himself when he referred to the failure of the defense attorney to call the cooperating witnesses liars on the stand. Mr. Grant said in closing "Not one of those lawyers ever called him a liar. Did you notice that? Think about it." There was a cautionary instruction given after an objection.

Defendants also assert that the Commonwealth's improper vouching for the cooperating witnesses constituted reversible error. As we have found that there was prosecutorial misconduct in the closing which requires a reversal of the judgment of sentence, we need not address this. However, when combined with the "wolf pack," "group of criminals," and "made members" remarks, we believe that reversible error occurred. We can reasonably conclude that the defendants were prejudiced by the prosecution's remarks in the aggregate. *See Commonwealth v. Bricker,* 506 Pa. 571, 487 A.2d 346 (1985). Such remarks in their number and egregiousness could easily taint the jury's ability to reach a verdict objectively. *Collins, supra; Brooks, supra.*

On remand the Commonwealth should be cautious in presenting issues, where in presenting them, their conduct might come in issue. A case can be won on the evidence with proper support for witnesses when needed, consider-

wealth went on to his next point, that the defense attorneys never called Gino Milano a liar when he was on the stand. The objection was lodged a mere six sentences after the discussion of the wolf pack. Although the trial court, in ruling on Mr. Pinsky's objection, stated the references were made five to ten minutes earlier, we fail to see how it would take even five minutes for six short sentences to be delivered to the jury. We conclude that the objection was timely.

ation of one's choice of language, and a general propensity to understand that the Commonwealth's client is justice.

This judgment of sentence is therefore reversed as to all defendants.[36]

## CONCLUSION

For all of the foregoing reasons the judgments of sentence are reversed. The case is remanded for a new trial. Jurisdiction is relinquished.

FORD ELLIOTT, J., files a dissenting statement.

FORD ELLIOTT, Judge, dissenting.

I must respectfully dissent. As to the majority's first ground for reversal, while I agree that there must be a further inquiry to determine the extent, if any, of the intrusion into the strategies of the defense caused by the testimony of Eugene Milano, I would limit relief at this time to a hearing to determine whether, in fact, any strategic or defense information was relayed.

As to the majority's determination that prejudicial error was committed by the admitted references to "Made" Membership in the Mafia, I cannot agree that such evidence was inadmissible and nonprobative. As set out by the majority, evidence of other crimes is admissible when it tends to establish motive or is so intertwined or interrelated to the present offense such as to show common plan, scheme or design. I accept the Commonwealth's explanation for both the relevancy and the admissibility of the challenged evidence and adopt from the Commonwealth's brief as follows:

Similarly, evidence that under Scarfo participation in a killing was a prerequisite to Mafia membership was also admissible because it provided strong evidence of motive, incentive and reward. For three defendants, Philip Nar-

---

**36.** Various defendants raise other issues of counsels' ineffectiveness. Because of our decision reversing this case on the prosecutorial misconduct allegation and suggestions of prior criminal activity, we have no reason to address these claims.

ducci, Ligambi and Nicolos Milano, the D'Alfonso murder was their ticket to induction into the Mafia. Scarfo promised to initiate them when the killing was accomplished, and he later fulfilled that promise by formally inducting them at ceremonies after D'Alfonso's death. Moreover, co-defendant Larry Merlino, although already a capo in the Mafia, specifically shared this initiation motive when he nominated his friend Ligambi for the team of killers in order to insure Ligambi's Mafia induction. While other defendants who were already Mafia members, may not have personally shared this initiation incentive for their participation in the D'Alfonso killing, they implicitly adopted this goal on behalf of the others by supervising the murder plan, as in the cases of defendants Iannarella, underboss Salvatore Merlino and witness Thomas Del Giorno, or by assisting in the stalking and murder so that their brothers would be inducted, as in the cases of defendant Frank Narducci, brother of defendant Philip Narducci, and witness Gino Milano, brother of defendant Nicolos Milano.

Finally, despite defense assertions to the contrary, there was no undue prejudice as a result of evidence referring to participation in murder as a Scarfo membership rule. Not only was there testimony from Gino Milano that mob rules were often broken but consistent with the defense request, the trial judge, in his final jury charge, explicitly instructed the jurors as to the limited purpose for which evidence of other offenses and organizational affiliation had been introduced and could be considered. Defendants did not object to this instruction, which comported with the applicable law and adequately instructed the jury as to their duty in evaluating this evidence. *Commonwealth v. Billa, supra.* Accordingly, defendants' claim that 'other crimes' evidence was wrongly introduced at trial must be denied.

Appellee's brief at 54–56 (Notes of testimony citations omitted).

Likewise, I must disagree with the majority's grant of relief based on prosecutorial misconduct. At oral argument, I, too, expressed my serious concerns about what I considered to be the District Attorney's unnecessary conduct which allowed for allegations of misconduct to be raised with ease and numerosity. I was challenged by the very able appellate advocate representing the Commonwealth, to carefully review the entire context of the closing arguments before coming to any conclusions on the merits of the allegations. This I have done and now conclude that while the references made by the Commonwealth upon which the majority reverses may have been unnecessary and risky, I cannot find them to be wholly inappropriate based upon the evidence presented at trial and the closing arguments of defense counsel. *Commonwealth v. Badman*, 398 Pa.Super. 315, 580 A.2d 1367 (1990); *Commonwealth v. Phillips*, 398 Pa.Super 58, 580 A.2d 840 (1990), *appeal denied*, 527 Pa. 643, 593 A.2d 417 (1991); *Commonwealth v. Goins*, 508 Pa. 270, 495 A.2d 527 (1985); *Commonwealth v. Johnson*, 336 Pa.Super. 1, 485 A.2d 397 (1984).

The prejudice attending the District Attorney's remarks must be weighed within the context of a given case. While I find the metaphoric "wolfpack" references utilized by the district attorney to be hard hitting and compelling rhetoric, I must also find it to be within the bounds of responsive comment to the biblical references utilized by defense in closing argument. Additionally, the context of the district attorney's remarks, albeit very graphic, were directly related to the Commonwealth's theory of the conspiratorial nature of the murder involved. In the recent case of *Commonwealth v. Jones*, 530 Pa. 591, 610 A.2d 931 (1992), our supreme court had occasion to review a claim of prosecutorial misconduct which involved the prosecutor's references to defendants in closing argument as "murdering, child-killing, backshooting trio" likening them also to "slaughterers" or "executioners." Therein the supreme court stated: "We have reviewed all nineteen of the ex-

cerpts cited by appellant and find none which would warrant relief. Nearly all of the comments were justified as having a reasonable basis in the record and as being within the bounds of vigorous oratory permitted a prosecutor in closing argument." *Id.*, 530 Pa. at 617, 610 A.2d at 943.

I would affirm the judgments of sentence.